STATE ex rel. PHILLIPS v. CARTER, State Auditor.

*99 P. 2d 1025.*

No. 29678.   Feb. 20, 1940.

Mac Q. Williamson, Atty. Gen., Randell S. Cobb, Asst. Atty. Gen., and Houston W. Reeves, Asst. Atty. Gen., for plaintiff.

Charles E. McPherren, of Oklahoma City, for defendant.

Hayes, Richardson, Shartel & Gilliland, of Oklahoma City, amici curiae.

GIBSON, J. The Governor of Oklahoma brings this original action in this court against the State Auditor to compel the issuance of nonpayable warrants of the state in payment of current claims incurred by various institutions, departments, officers, and employees pursuant to appropriations made by the Seventeenth Legislature for the fiscal year ending June 30, 1940. The claims are within the limits of the appropriations made therefor by the Legislature for the first year of the biennium for which the regular session of the Legislature appropriated revenues.

It is conceded that the State Treasurer will register and deliver the warrants, if issued, but the Auditor has declined to issue nonpayable warrants on the ground that at the time the claims were reached in regular order there were not sufficient moneys or revenues in the State Treasury to meet payment. The petition lists specifically sundry claims presented during December, 1939, and the first part of January, 1940, for several of the state's hospitals and schools, the State Penitentiary, the Board of Affairs, Board of Health, and the Industrial Commission. It is alleged that these are representative of numerous other lawful claims filed with the Auditor, and the Auditor asserts that the claims listed are only about 1.13 per cent. of the claims on file at the time of the filing of the petition herein. The financial condition of the state at the date of filing the petition, January 22, 1940, is set forth in the answer of the Auditor, from which pertinent allegations will be quoted.

It is apparent from the Auditor's answer that, although revenue might have accrued to pay some of the claims on file, there will be a continued refusal to issue warrants for other claims for the payment of which revenues are not or will not be available. Among the claims for which warrants are requested are those for school aid under Senate Bill No. 22 enacted by the Seventeenth Legislature (Session Laws 1939, ch. 34, art. 14). The petition of the Governor alleges that the action of the Auditor in refusing to issue nonpayable warrants for the institutions, the school aid, and the departments of government is embarrassing the state in carrying out its governmental functions. He alleges that the laws of the state are being thwarted and that as Governor he is empowered to bring this action in the name of the state. He appears by the Attorney General, and the Auditor, consequently, appears by other counsel, but in his official capacity. The right of each party so to appear is not questioned.

It is apparent, of course, that the matter is of great public interest, and, because of the many functions of government affected, demands as prompt a decision as possible to be given with due regard to the questions presented. This court accordingly assumed jurisdiction, and with the cooperation of counsel has advanced the hearing. By permission of the court counsel representing specially various groups and individuals affected have filed brief and made argument in support of the Governor's position. The case has been adequately presented by all parties.

A stipulation of facts has been filed, which in some essentials admits the financial condition and acts alleged in the Auditor's answer. Since the pertinent parts of his answer succinctly state such facts and his position herein, we quote therefrom as follows:

"III.

"That to the date of the filing of the petition herein, January 22, 1940, the defendant as State Auditor had written and transmitted to the State Treasurer, and the said Treasurer had registered warrants against the General Revenue Fund of the state in the total amount of $8,750,836.39, which warrants against the said General Revenue Fund were registered and returned by the State Treasurer without being marked 'Nonpayable,' and said warrants were delivered by the State Auditor to the various departments and institutions as required by section 1 of article 1, chapter 3, Session Laws of 1939. That, as is hereinafter stated, the said warrants

so written, registered and delivered were in excess of the revenue and funds in the State Treasury to the credit of the General Fund in the amount of $400,000.

## "IV.

"That the amount of warrants so written and transmitted by the State Auditor to the State Treasurer and registered and delivered being $400,000 in excess of the amount of revenue which had accrued in the State Treasury to the credit of the General Fund from taxation, transfers and other miscellaneous sources, the defendant as Auditor declined to transmit warrants in recognition and based upon claims thereafter presented in excess of the said $400,000. That prior to the said date of January 22, 1940, claims over and above the said $400,000 had been filed by the said various departments and institutions in the sum of $2,009,085.85. That the claims herein sued upon total only the sum of $22,748.75, being only about 1.13% of said claims now on file with the defendant as State Auditor."

The answer then asserts that there is no possibility of the revenues for the fiscal year being sufficient to meet the appropriations, and that there will be a deficit of several millions of dollars. This estimate is controverted.

The Auditor further states his position and the question involved as follows:

"That there is no reason to differentiate between the allowance, auditing and issuance and delivering of said warrants to cover the 1.13% of the said claims now on file with the defendant as State Auditor, and omitting the balance of $1,986,337.10, and the $13,300,864.67 in claims that will accrue during the remainder of this fiscal year. That the controlling question as to all said claims and all claims that may be filed with the defendant as State Auditor during the remainder of the present fiscal year is as to whether or not it is the duty of this defendant as State Auditor to continue to audit and approve claims against the General Fund of the state and issue state warrants thereon against the General Revenue Fund of the state, and cause same to be registered by the State Treasurer as 'nonpayable,' and deliver same as evidence of indebtedness of the state greatly in excess of more than $400,000 above the amount of all revenue that could possibly accrue to the General Fund of the state for the fiscal year."

The stipulation presents the following additional information:

"That the total appropriations made from the General Fund of the state of Oklahoma for the preceding biennium by the Sixteenth Legislature and for the current biennium by the Seventeenth Legislature, and the difference between said appropriations are as follows:

Fiscal year 1937-38 ....$34,157,195.23
Fiscal year 1938-39 .... 28,499,640.75
  Total for last biennium ............$62,658,835.98
Fiscal year 1939-40 ....$26,513,840.19
Fiscal year 1940-41 .... 25,802,525.03
                                        52,316,365.22
                                        ─────────────
Decrease for current biennium ....$10,340,470.76

"That the decrease in appropriations for the corresponding years of the preceding biennium as made by the Sixteenth Legislature and the current biennium as made by the Seventeenth Legislature is as follows:

Fiscal year 1937-38 ....$34,157,195.23
Fiscal year 1939-40 .... 26,513,840.19
  Decrease .................... $7,643,355.04
Fiscal year 1938-39 ... $28,499,640.75
Fiscal year 1940-41 .... 25,802,525.03
  Decrease .................... $2,697,115.72

"That revenues collected by the Oklahoma Tax Commission and revenues accruing to the General Fund in the State Treasury during the fiscal years 1935-36, 1936-37, 1937-38 and 1938-39 are as follows:

| Fiscal Year | Tax Commission Collections | Revenues Accruing To General Fund |
|---|---|---|
| 1935-36 | $43,372,964.80 | $22,812,685.72 |
| 1936-37 | 56,429,543.04 | 27,389,171.03 |
| 1937-38 | 61,718,991.61 | 24,388,014.10 |
| 1938-39 | 56,252,182.13 | 19,756,732.05" |

The stipulation further shows that during the session of the last Legislature, the Research and Statistics Division of the Tax Commission furnished reports to the members of the Legislature showing receipts of revenues by the state from all sources for various portions of the fiscal year ending June 30, 1939, as compared with the corresponding periods of the previous fiscal year, the one for January, 1939, covering a

six months' period, the one for February a seven months' period, the one for March an eight months' period, the one for April a nine months' period, and each covering also specifically the last preceding month and comparison with the corresponding month of the previous fiscal year. The conclusion from these reports is that on the whole there was a substantial decrease in income to the state, illustrated by the nine months' report covering three main sources of revenue to the general fund; gross production tax approximately 30 per cent. decrease; income tax approximately 16 per cent. decrease; and cigarette tax approximately 1.6 per cent. decrease. For the corresponding six months' periods (first half of fiscal years), however, the decrease had been, respectively: gross production tax approximately 23 per cent. decrease; income tax approximately 35 per cent. decrease; cigarette tax approximately .35 per cent. decrease.

In addition it is stipulated that a joint survey committee of the Legislature reported tentatively to the House of Representatives an estimate that revenues for the general fund under the laws then existing would not exceed $21,000,000. The report was filed and published, but was never adopted by the Legislature. By agreement the Auditor has filed affidavits showing collections by months of various revenues during 1937, 1938, and 1939, and the financial condition of the general fund for each month. The information given supports the contention that at the present rate of collection the revenues will not meet the appropriations made. On the other hand, affidavits filed on behalf of the relator by members and employees of the Tax Commission are to the effect that there was a substantial increase in state revenues for the three months prior to February, 1940, and that it is impossible to tell how much, if any, the deficit at the end of the year will be. These affidavits are attacked by a counter affidavit. In view of the foregoing, therefore, it is apparent that if the court were compelled to decide the question, it might find difficulty in deciding as a fact how great the deficit, if any, may be at the end of the fiscal year. In view of the decisions, however, we find it unnecessary to decide the question; for if we assume that the revenues will not meet the appropriations by more than the $400,000 (fixed by the Auditor as the limit to which he will issue nonpayable warrants), we feel that the statutes and the decisions make clear the duty of the Auditor to issue warrants to the extent of the appropriations made by the Legislature.

The prerogative of making appropriations lies with the Legislature and upon it lies the responsibility to make the revenues meet the approprations. Those are its constitutional functions, and neither the administrative officers charged with the receipt and disbursement of the revenues nor the courts can annul valid appropriations made. The rules are well settled by prior decisions of this court. We are here called upon to reverse these rules, and to set up, as it were, a new fiscal policy. The earnestness with which the contention has been made leads us to review, though as briefly as possible, the decisions controlling here.

Sections 3547 and 3558, O. S. 1931, and section 1, article 13, chapter 20, S. L. 1937, provide for auditing accounts against the state, and the issuance of warrants by the Auditor, which shall be " 'payable' or 'nonpayable' as the case may be"; and that "when any warrant shall be presented to the Treasurer for redemption, and there shall be no funds in the treasury appropriated for that purpose, the Treasurer shall endorse thereon the date of its presentation * * * and thereafter such warrant shall draw interest," etc. Nothing is said in the statutes as to the amount to which nonpayable warrants can be drawn, and the only limit to the amount is the appropriation made for the purposes. It is, therefore, clearly the duty of the Auditor to issue the warrants here, and all other warrants for claims coming within the appropriations made

by the Legislature, unless he is prohibited by some constitutional provisions.

Issuance of nonpayable warrants has been a part of our state financing system since statehood. The people in adopting our Constitution must be presumed to have been familiar with the method adopted. A large part of the financing in the early days of statehood came from ad valorem taxation. Taxes from this source reached the state's treasury six months after the beginning of the fiscal year which under the Constitution begins July 1st. Consequently, it was often necessary to issue nonpayable warrants, and so far as the record in this case is concerned, the right so to issue was never seriously questioned until recently. And such warrants have never been considered debts within the constitutional provisions invoked here. The question was early decided in the case of Bryan v. Menefee, State Treasurer, 21 Okla. 1, 95 P. 471. There this court said:

"The next question arising is whether or not a warrant drawn by the proper officer on the Treasurer of the state under an appropriation by law is an evidence of indebtedness. In the case of In re State Warrants, 6 S. D. 521, 62 N. W. 102, 55 Am. St. Rep. 852, in construing sections 1 and 9 of article 11, and 1 and 2 of article 13, of the South Dakota Constitution, the court held:

" 'Appropriations from the assessed but uncollected revenues of the state, and the issuance of warrants in pursuance thereof to defray current expenses, is not the incurring of an indebtedness, within section 2, art. 13, Const., which provides that to make public improvements, or to meet extraordinary expenses, or deficits or failure in revenue, the state may contract debts never to exceed with previous debts, $100,000, and no greater indebtedness shall be incurred, except to repel invasion, suppress insurrection or defend the state or United States in war.'

"Section 23, art. 10 of our Constitution (Bunn's Ed. sec. 289), is substantially the same as section 2, art. 13, of the South Dakota Constitution, and in the same case the court further held:

" 'The fact that warrants issued in anticipation of such assessed revenues draw interest does not make the issuance of the warrants an incurring of indebtedness to the extent of such interest, within article 2, sec. 13, of said Constitution, where such warrants, with respect to interest, are not different from other warrants which may properly be drawn and issued.' "

The court quoted further from a North Dakota case, which approved the South Dakota rule: That the revenues of the state assessed and in process of collection may be considered as constructively in the treasury, they may be appropriated and treated as though actually and physically there, and an appropriation of them by the Legislature does not constitute the incurring of an indebtedness, within the meaning of the Constitution. This court then said all of article 10 of our Constitution pertaining to "public indebtedness" is substantially taken from the Constitutions of North and South Dakota.

Later, in the case of In re Application of State to Issue Bonds to Fund Indebtedness, 33 Okla. 797, 127 P. 1065, the court said that the limitations of section 23, art. 10, of the Constitution were not intended to apply to that class of pecuniary obligations arising out of the ordinary necessary current expense of maintaining the state government and which were in good faith intended to be paid and were lawfully payable out of the current yearly revenues, and other resources of the state for the fiscal year within which such obligations were incurred.

These interpretations have been acquiesced in for nearly 30 years, by the courts, by the Legislature, by the administrative officers charged with handling the finances, and presumably by the people, who have not changed the provisions construed, although abolishing the ad valorem tax for state purposes in 1933. But the 1933 amendment to section 9 of article 10 of the Constitution did not take from the Legislature the prerogative to make appropriations and to determine whether the

amount of revenue provided would be sufficient to meet those appropriations. Nowhere do we find the power given to the courts to pass upon the good faith of the Legislature.

In the case of Davis v. Childers, 181 Okla. 468, 74 P. 2d 930, we said:

"The Constitution does not give the courts veto power over appropriations made by the Legislature, but fixes upon the Legislature the responsibility of making appropriations and raising sufficient revenues to finance such appropriations.

"The courts will not usurp the high prerogative exercised by the Legislature in making appropriations for state purposes, and, when called upon to review legislative acts, can neither assume bad faith on the part of the Legislature nor inquire into the motives or intent of the Legislature by evidence other than its recorded proceedings. Testimony of individual legislators or others as to happenings in the Legislature is incompetent, since that body speaks solely through its concerted action as shown by its vote.

"Under the provisions of the Oklahoma Constitution, if the Legislature has misjudged the amount of revenue to accrue from taxes levied and estimated to produce sufficient revenues during the biennium for which it makes appropriations, it may, at special session, or at the next regular session during such biennium, provide for additional revenues to meet such failure in revenues. Section 3, art. 10, of the Constitution. The courts, therefore, assume that its constitutional duty will be performed."

In that case we were but restating the rules which had been applied and followed for more than a quarter of a century.

The rule is the same as to municipalities, including school districts, which after appropriations have regularly been made, are authorized to issue warrants to the full extent of the appropriations, notwithstanding the fact that the revenues provided fail to meet the appropriations, and this under section 26, art. 10, of the Constitution, which is more restrictive than the provisions relating to the state. Such nonpayable warrants have not been considered debts within the meaning of the Constitution. See Blake v. Abraham, 149 Okla. 112, 299 P. 488; Kurn v. Helm, 182 Okla. 260, 77 P. 2d 552.

It is evident, therefore, that the practice and decisions have been uniform during all these years. We do not think it the province of the court to change this fiscal policy because it may by some be thought insufficient for our present revenue measures.

In 11 Am. Jur. p. 659, par. 50, it is said:

"A cardinal rule in dealing with Constitutions is that they should receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time, even though the circumstances may have so changed as to make a different rule seem desirable."

In William J. Scown, Appellant, v. Anthony Czarnecki et al., Appellees (Ill.) 106 N. E. 276, it is said:

"The court is the same, though the judges change, and it will not overturn a deliberate decision upon the constitutional power of the Legislature under which the highest political rights have been held and exercised without question for many years. * * *"

There are other cases by this court construing the constitutional provisions involved which we would be compelled to overrule to reach a different conclusion. It is suggested that the Governor should call the Legislature in special session. We have said that the Legislature may, in special session, during either of the fiscal years of the biennium or at the next regular session, levy taxes to meet any deficiency that may occur under the express authority given it by section 3 of article 10 of the Constitution. See Davis v. Childers, 181 Okla. 468, 74 P. 2d 930. But the people by their Constitution have seen fit to entrust exclusively to the Governor the right to call the Legislature into special session. They have further by that instrument provided that at any time dur-

ing the succeeding fiscal year the Legislature may provide for supplying any deficiencies in revenues accruing for a fiscal year. Article 10, section 3. The people also left to the Governor the power to judge the necessity of submitting financial statements either to a special or regular session of the Legislature by giving him the power to call special sessions (article 6, section 7) and requiring him to report fully to a regular session. (Article 6, section 9.)

We have here assumed that the allegations of the Auditor's answer may be true, and have found that, even if true, they constitute no reason not to follow the statute. But we are not here holding that there will be the deficit he claims. In the affidavits filed on behalf of relator it is stated by a member and a director of the Oklahoma Tax Commission:

"Affiants further say that it is impossible at this time to estimate with accuracy the amount of deficit, if any, which may be sustained in the General Revenue Fund during the present fiscal year, because of the many contingencies affecting tax collections which may occur between this date and June 30, 1940; that it is entirely possible no deficit whatever will exist in said Fund on June 30, 1940. * * *"

Though this statement may be said to be a conclusion, it constitutes a challenge to the statements made on behalf of the respondents. But by virtue of the legal propositions involved, it is not necessary to decide the question of probabilities presented.

Since the appropriations under which the claims have been or will be filed are not challenged on other grounds than those considered, it follows that the Auditor should be, and he is, directed to deliver warrants for the claims filed with him within the appropriations, in accordance with the statutes hereinabove cited.

Writ ordered.

BAYLESS, C. J., and RILEY, OSBORN, CORN, DAVISON, and DANNER, JJ., concur. WELCH, V. C. J., and HURST, J., dissent.

———

WELCH, V. C. J. (dissenting). It is the theory, and the holding in effect, of the majority opinion that *there is no constitutional limitation on the state debt that may result from the issuance of interest-bearing, nonpayable, general fund warrants, so long as they are issued within an appropriation by the Legislature.*

*It is my view that there is a constitutional limitation thereon,* and that the same is set out in section 23 of article 10 of the Constitution. That section provides in part as follows:

"The state may, to meet casual deficits or failure in revenues, or for expenses not provided for, contract debts; but such debts, direct and contingent, singly or in the aggregate, shall not, at any time, exceed four hundred thousand dollars. * * *"

Thus my dissent to the adopted view is made clearly apparent and is easily stated.

When we have in mind the many and varied purposes for which the Legislature in its discretion may appropriate public money, it must be evident that the Constitution could not and did not intend that upon all such appropriations, nonpayable, interest-bearing warrants could be issued in unlimited excess of revenues provided.

I readily agree that this court cannot veto appropriations, but I cannot concur in the view that this court should, by mandamus, compel the issuance of warrants, and thus add several millions of dollars to the casual deficit which already exists for this fiscal year in the sum of $400,000. It goes without saying that the deficit now existing, and to be increased by the warrants issued pursuant to the majority opinion, is a casual deficit for failure of revenue or loss or decline in revenue. I think it is such a casual deficit as is specifically referred to in the Constitution.

While the plaintiff's brief suggests that there may be little or no deficit by the end of the fiscal year, we are satisfied that the facts shown demonstrate that in all probability the present deficit will continue to the end of the fiscal year in the sum of several million dollars. However, if the contrary hope is realized, then no possible harm could result from a decision of this court for the defendant. It being the State Auditor's theory in effect that he should issue warrants when there is revenue to pay them, or when the outstanding current warrants do not exceed the constitutional limit of $400,000 for such a casual deficit. Therefore, of course, if by the end of this fiscal year there is no deficit, or is less than $400,000 of deficit, then all claims of every character will be fully and promptly paid in cash or by nonpayable warrants which would be within this debt limitation specifically authorized by section 23, article 10, of the Constitution.

I agree with the rules of law announced in paragraphs 1, 2, and 3 of the syllabus of the majority opinion, but they are not controlling here. We are not here called upon to say that certain appropriations are invalid. We are called upon to say whether warrants in unlimited excess of revenue may be legally issued, and whether we will or will not compel the State Auditor to issue warrants when he has already issued current warrants up to the full amount of revenue received, plus the $400,000, to which excess he may go under the Constitution.

In Davis v. Childers, 181 Okla. 468, 74 P. 2d 930, this court was called upon to determine the validity of legislative appropriations. It was a suit attacking the appropriations, and we there held as stated in paragraph 2 of the syllabus here. That case did not present a direct attack upon the issuance of interest-bearing warrants.

The majority opinion holds that warrants must be issued above the aforesaid limit of excess, and without regard to that or any limitation, so long as they are within the legislative appropriation. It is with this conclusion that I cannot concur.

This court has never before held that warrants must be issued under such circumstances. In Bryan v. Menefee, 21 Okla. 1, 95 P. 471, this court considered an action in mandamus to compel the payment of a certain warrant which had been regularly and legally issued. There was money in the treasury to pay the warrant there involved, and of course the judgment and decision of the court required the payment thereof.

The majority opinion mentions the rule as to municipal warrants, with the suggestion that nonpayable municipal warrants have not been considered debts within the meaning of the Constitution, citing Blake v. Abraham, 149 Okla. 112, 299 P. 488, and Kurn v. Helm, 182 Okla. 260, 77 P. 2d 552. I am unable to find anything in those decisions supporting that statement in the majority opinion or supporting the conclusion of the majority opinion. On the contrary, we have in three cases held, as to municipal warrants, that where the appropriation was legal and warrants were issued within the appropriation, but for lack of collection of the anticipated revenue the warrants could not be paid and were therefore outstanding as nonpayable interest-bearing warrants, that such warrants did constitute debts of the municipality. See School District No. 2 v. Gossett, 140 Okla. 243, 283 P. 249; Kansas City S. Ry. Co. v. Board of Education, 158 Okla. 274, 13 P. 2d 115, and Mansville Consolidated School Dist. v. Williamson, 174 Okla. 18, 49 P. 2d 749.

As to the case In re Application of State to Issue Bonds to Fund Indebtedness, 33 Okla. 797, 127 P. 1065, that case furnishes authority for the issuing of funding bonds to refund outstanding interest-bearing warrants, but in my judgment does not furnish authority requiring this court to compel the issuance of warrants upon all claims under appropriations, in view of the number, character, and amount of appropriations

which may be made, and in view of the already existing deficit in the general fund for this fiscal year. The last-cited decision should be carefully read to observe the restrictions of certain rules therein to "obligations arising out of the ordinary, necessary current expense of maintaining the state government." That quotation appears in the first paragraph of the syllabus dealing with the debt limitation of section 23, article 10, of the Constitution.

It is my view that our constitutional duty requires us to fully observe the constitutional debt limit applicable here, and to deny any writ of mandamus compelling the Auditor to now issue nonpayable interest-bearing warrants in the sum of several million dollars.

HURST, J. (concurring in part and dissenting in part). I concur in the conclusion that the writ should issue to compel the State Auditor to issue non-payable warrants, but only up to the point where the reasonably anticipated revenue to be collected and to accrue to the general revenue fund during the present fiscal year will be exhausted. It does not appear that that point has been reached or will be reached prior to April. Warrants so issued do not constitute debts, but are proper charges against such fund. Kelley v. Baldwin (Pa. 1935) 179 Atl. 736; State Budget Commission v. Lebus (Ky. 1932) 51 S. W. 2d 965; State v. Medbery (1857) 7 Ohio St. 522.

I dissent, however, to the reasoning of the majority in holding that there is no constitutional limitation on debts that may be created by appropriations in excess of the revenue provided, followed by the issuance of warrants in excess of the revenue actually collected during the fiscal year, followed by the issuance of funding bonds to take up such warrants. The result of this process is a debt for current expenses to pay casual deficits or failure in revenue.

Warrants issued in excess of the revenue undoubtedly constitute a form of debt, for it is held in the funding bond cases that the issuance of funding bonds to take up such warrants does not increase the debt, but simply changes the form of an existing debt. It is well settled in other jurisdictions having similar constitutional provisions that such warrants do constitute a debt, but an invalid debt unless approved by the people in the manner authorized by constitutional provisions similar to our section 25, art. 10. See Rowley v. Clarke (Iowa, 1913) 144 N. W. 908, 912; State v. State Board of Examiners (Mont. 1921) 197 P. 988; Billeter & Wiley v. State Highway Commission (Ky. 1924) 261 S. W. 855; In re State Warrants (S. D. 1895) 62 N. W. 101; Fergus v. Brady (Ill. 1917) 115 N. E. 393. While such warrants do not constitute enforceable obligations, they probably constitute moral obligations so that under section 3 of art. 10 they may be paid by appropriations during succeeding fiscal years if the Legislature elects to do so.

The funding bond decisions construed the debt limitation provisions of the Constitution as not being a barrier to the unlimited issuance of funding bonds to take up warrants issued in excess of the revenue actually collected. Now the majority opinion in this case in effect says that there is no barrier to the issuance of such excessive warrants, and it will go to the extent of compelling, by the discretionary writ of mandamus, their issuance. Thus the constitutional prohibitions against excessive spending are, by process of interpretation, rendered ineffective and the power of the Legislature to create debts for current expenses is unlimited, and this despite the provisions of sections 2, 23, 24, and 25 of art. 10 of the Constitution that "The Legislature *shall* provide by law for an annual tax sufficient, with other resources, to defray the estimated ordinary expenses of the state for each fiscal year" (sec. 2) and "The state may, to meet casual deficits or failure in revenue, or for expenses not provided for, contract debts; but such debts, direct and contingent, singly or in the aggregate, shall not at any time, exceed four hundred thousand dollars, * * *"

(sec. 23.), and "In addition to the above *limited power to contract debts,* the state may contract debts to repel invasion, suppress insurrection or to defend the state in war. * * *" (sec. 24.) And "Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this state" unless approved by a vote of the people of the state. (sec. 25.)

The effect of the funding bond decisions and the majority opinion in this case is simply this: The word "shall" used in section 2 is held to mean "may," so that the Legislature is simply advised that it may balance the budget, contrary to the rule for construing it in the Constitution. 11 Am. Jur. 687. The words of section 23 that debts arising out of casual deficits, failures in revenue, or for expenses not provided for "shall not, at any time, exceed four hundred thousand dollars" are rendered ineffective. The words "limited power to contract debts" used in section 24, referring to the four hundred thousand dollar provision of section 23, are made to mean "unlimited power to contract debts" to meet casual deficits, failures in revenue, or expenses not provided for. The provision of section 25 that, except for the limited power to contract debts as provided in sections 23 and 24, "no debts shall be hereafter contracted by or on behalf of this state" without the sanction of the people, is rendered worthless. Just two years ago, this court, in Boswell v. State (1937) 181 Okla. 435, 74 P. 2d 940, held that "the debt limitation provisions of the Constitution are a vital part of that document." But if the funding bond decisions and the majority opinion in the instant case are to be adhered to, where is there any vitality left in said provisions? There is not a word used in these provisions that the average layman would not understand without consulting a dictionary. We should not seek some hidden meaning in these provisions, nor should we place a forced or unnatural construction on the language used. Our duty is to apply them as they were understood

by the framers of the Constitution and the average laymen who adopted the Constitution in 1907, for to do otherwise is to amend the Constitution and change its meaning under the guise of construction. In Boswell v. State, supra, we quoted from Cooley Rules of Construction, applied these principles of construction to these sections, and held that the word "debt" must be given its ordinary meaning.

In the former decisions, this court has been faced with the issue of approving funding bonds to take up warrants previously issued in excess of the revenue collected, and I think the court in those decisions misconstrued the debt limitation provisions. I stated my views on this question with citation of authorities supporting them in a specially concurring opinion in Re Funding Bonds of 1939, 185 Okla. 10, 90 P. 2d 19. In three other cases (Graham v. Childers, 1925, 114 Okla. 38, 241 P. 178, Davis v. Childers, 1937, 181 Okla. 468, 74 P. 2d 930, and Schmoldt v. Bolen, 1938, 183 Okla. 191, 80 P. 2d 609) this court required the issuance of warrants, but it did not appear in those cases that a deficit was likely to result from the issuance of the warrants, as appears in this case.

It is argued that under the doctrine of stare decisis we are committed by these prior decisions to a construction of the Constitution so as to require the issuance of warrants up to the limit of the appropriations, and the refunding of those in excess of the revenue actually collected. Of course, I agree that the rule of stare decisis is a good one and makes for stability in decisions, and under it prior decisions should not be overruled except for impelling reasons. As I have pointed out, in none of the cases has this court been faced with the precise question here involved (requiring the issuance of warrants when a deficit is reasonably certain to result), and in such a case the doctrine of stare decisis does not apply. 14 Am. Jur. 289. Furthermore, there is a rule that "in matters involving the interpretation of the Constitution it is usual and proper

to give less force to the doctrine of stare decisis than in other cases." 14 Am. Jur. 288. This rule is based upon the proposition that the Constitution, being difficult to change, should be construed according to its true meaning, and its meaning should not be changed by erroneous decisions which have the effect of amending it in a manner not provided in the Constitution.

"The rule will not be invoked to sustain and perpetuate a principle of law which is established by a series of decisions clearly erroneous, unless property complications have resulted therefrom and a reversal which result in greater injury and injustice than would ensue by following the rule." 14 Am. Jur. 291.

It was under this rule that three members of this court concurred specially in the 1939 Funding Bond Case. In two early decisions (In re Menefee v. State, 22 Okla. 365, 1908, 97 P. 1014, and Campbell v. State, 23 Okla. 109, 1909, 99 P. 778) written by Justice Williams, and concurred in by Justices Hayes and Kane, all members of the Constitutional Convention, language was used indicating that the debt limitation provisions should be held to forbid a debt for casual deficits in excess of $400,000. Then, in Re Application of State to Issue Funds to Fund Indebtedness (1912) 33 Okla. 797, 127 P. 1065, by a three to two decision, it was held that funding bonds could be issued to take up warrants, issued pursuant to appropriations, when the warrants were more than $400,000 in excess of the actual collections for the fiscal years during which they were issued. Justice Harrison, the sole member of the Constitutional Convention participating, dissented. Thus it appears that all the members of the Constitutional Convention, who as members of this court have spoken or voted on the subject, have entertained the view that the $400,000 provision is a limitation on the power of the Legislature to create debts and should be made to mean what it plainly says.

The result of following the last-cited decision is shown by a tabulation of the fiscal condition as it exists today submitted by the State Auditor. The state has operated on a deficit during eight of the last ten years, the total deficit for the eight years being $42,247,894.04. The present bonded indebtedness resulting from those deficits is now $25,373,681. The annual expense of paying the interest on, and amortizing the principal of, this debt is $2,353,053.28, and is payable out of the general revenue fund.

Under these circumstances I think the mischief that will be caused by following prior decisions justifies us in re-examining the constitutional provisions, before any further warrants are issued in excess of the revenue collected, and we should not permit the rule of stare decisis to stand in the way. It was admitted in oral argument that the constitutional provisions define the public policy of a balanced budget, but it was contended that the Legislature may disregard such public policy. It was also admitted that the funding bond decisions probably are contrary to the true meaning of the debt limitation provisions of the Constitution, but it was stated that they should be followed under the rule of stare decisis. Contrary to this argument, I think these sections of the Constitution not only define the public policy of a balanced budget, but they make it the mandatory duty of the Legislature and the Governor to balance the budget, with the proviso that a margin of $400,000 in excess of the collected revenue is allowed to meet casual deficits, failure in revenue, or to pay expenses not provided for, but the debt for such purposes shall not at any one time exceed $400,000. These provisions apply to all manner of debts. They are restrictions on the power of the Legislature to plunge the state into debt by appropriations and issuance of warrants in excess of the revenue, as well as by other methods. To hold otherwise is to remove all restraint on the Legislature. See State of Ohio v. Medbery et al., supra; Opinion of the Judges (Colo. 1889) 22 P. 464; People v. Johnson (Cal.

1856) 6 Calif. 499; Campbell v. State, (1909) 23 Okla. 109, 99 P. 778; State ex rel. Jones v. McGraw (Wash. 1895) 41 P. 893; In re State Warrants (S. D. 1895) 63 N. W. 101; Commonwealth v. Liveright (Pa. 1932) 161 A. 697; Kelley v. Baldwin, supra. These provisions should be binding on all departments of the government, and were intended to constitute a barrier beyond which the departments of the government may not lawfully go. They should not be disregarded through any consideration of expediency or to meet a temporary condition. They were written into the Constitution to protect the people from the effects of pressure by the various departments, institutions, and special groups against the Legislature for appropriations, in excess of the revenue provided for. They enjoin upon the Legislature a rule of sound public finance. The philosophy underlying these constitutional provisions was stated in strong language in 1857 by the Supreme Court of Ohio, construing provisions of the Ohio Constitution practically identical with sections 2, 23, and 24 of our Constitution, in State v. Medbery, supra, as follows:

"There is a wholesome, practical wisdom in the two constitutional provisions which require appropriations for expenditures, and the assessment of taxes to meet them, to be made by the same general assembly. Each member is thus compelled, during his official term, to visit upon his constituents the pecuniary consequences of his sanction of liabilities to be incurred and of appropriations made, and he places himself and his consummated acts in direct and immediate communication with his tax-paying constituents at the right time, and in a manner which servile partisans may heed, and corrupt and mercenary leaders understand. Payment not only goes hand in hand with expenditures, but wasteful expenditures, instead of being concealed or mitigated by delay of payment or the creation of debts, must be immediately made known to the people, through the demands of the tax-gatherer for the money. This system is wholesome in its effect upon those who control and can squander the taxes. They are made sensible that their delinquencies will be known by being immediately felt by their constituents. It is wholesome in its effect upon the people. Their self-interest is provoked to prompt scrutiny into the conduct of their public agents. Aside from its economical effects, it is a wise policy. It tends to protect the state from the corruption which inevitably follows generous expenditures, an evil much greater than unnecessary and burdensome taxation."

It appears here from the record that the Seventeenth Legislature, conceiving it to be its duty to balance the budget, appointed a joint committee to make a survey and report an estimate as to the probable amount of revenue that would accrue to the general revenue fund of the state. This committee reported that the probable amount of such revenue would be $19,281,089.85 for each of the fiscal years 1939-1940 and 1940-1941. So great was the pressure upon the Legislature that the approved appropriations payable out of the general revenue fund for the fiscal year 1939-1940 aggregated $7,232,750.34 in excess of the estimated revenue, and this in spite of the earnest desire and effort to balance the budget. Of course there are so many factors to be considered that it is not possible to estimate to a mathematical certainty the revenue that will be collected in the future. The best that can be done is a fair approximation based upon the collections for prior years and present trends. In fact, the collections accruing to the general revenue fund from the five main sources for the first six months of the present fiscal year (1939-1940) were $1,723,-954.38 less than for the same period of the preceding fiscal year, a greater percentage of decrease in revenue than the committee had estimated. Considering all the facts to which our attention has been called, I think the conclusion of the State Auditor that if warrants are issued up to the full amount of the appropriations there will be a deficit of some $6,000,000 for the present fiscal year is justified. It follows from what I have said that I think it the duty of

the State Auditor to issue no warrants after the probable income for this fiscal year has been exhausted, and this court should not use language to the effect that his duty is to the contrary. In determining such amount the Auditor should resolve the doubt in favor of a balanced budget rather than a deficit.

The state must eventually come to the point of a balanced budget. We should not wait until the credit of the state is impaired by what the State Auditor refers to as a "perfect but simple circle" of excessive appropriations, followed by the excessive issuance of warrants, followed by the issuance of funding bonds, resulting in a constantly increasing debt. The taxpayers do well to pay the ordinary current expenses of government, without being required to pay large sums for the ordinary expenses of prior years.

The Constitution provides a way out of the present temporary financial difficulties. A special session of the Legislature could be immediately called and charged with the duty of balancing the budget by canceling or reducing appropriations, increasing present rates on existing sources of revenue (there is no constitutional limit on such rates), tapping new sources of revenue, or transferring present earmarked revenue to the general fund. I realize that this constitutes a difficult task, but it is far better than continuing the present unsound policy of recurring annual deficits and piling up debts contrary to the spirit and letter of the Constitution. It is the hard but sound way. And, of course, I mean no reflection on the present or past Legislatures or Governors by any language I have used or quoted. And difficult as their tasks are, the constitutional restraints are not satisfied by earnest efforts to comply with them, but only by actual compliance.

For the foregoing reasons I concur in the conclusion but respectfully dissent to the reasoning.