Dear Representative Reynolds:
This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:
 1. Are the funds made available to the State of Oklahoma from the State Fiscal Stabilization Fund, Sections 14000 through 14013 of the American Recovery and Reinvestment Act of 2009 ("ARRA"), custodial funds that are not subject to Section 55 of Article V of the Oklahoma Constitution, which requires appropriation of State money by the Oklahoma Legislature?
 2. Does the direct allocation of the funds made available to the State of Oklahoma from the State Fiscal Stabilization Fund, Sections 14000 through 14013 of the ARRA, violate the provisions of Section 23 of Article X of the Oklahoma Constitution, which requires that funds to be spent by various Oklahoma executive branch agencies be certified as available for expenditure by the State Board of Equalization?
 3. Does the direct allocation of the funds made available to the State of Oklahoma from the State Fiscal Stabilization Fund, Sections 14000 through 14013 of the ARRA, violate the Tenth Amendment to the United States Constitution? *Page 2 
 I. INTRODUCTION
On February 17, 2009, Congress passed the American Recovery and Reinvestment Act of 2009 ("ARRA"), Pub.L. No. 111-5, 123 Stat. 115
(codified in scattered sections of the U.S.C.). As stated in the opening paragraph of the ARRA, this Act made "supplemental appropriations for job preservation and creation, infrastructure investment, energy efficiency and science, assistance to the unemployed, and State and local fiscal stabilization, for the fiscal year ending September 30, 2009, and for other purposes." You ask whether the funds made available to the State of Oklahoma pursuant to the State Fiscal Stabilization Fund, Sections 14001 through 14013 of the ARRA, are custodial funds such that the provisions of Section 55 of Article V and Section 23 of Article X of the Oklahoma Constitution do not apply to them. You also ask whether receipt of the funds violates the Tenth Amendment to the United States Constitution.
 II. OKLA. CONST. art. V, § 55, REQUIRING LEGISLATIVE APPROPRIATION OF FUNDS PAID OUT OF THE STATE TREASURY,AND OKLA. CONST. art. X, § 23, REQUIRING CERTIFICATION OF AVAILABLE STATE FUNDS, DO NOT APPLY TO FUNDS THAT ARE CUSTODIAL IN NATURE.
You initially ask whether the provisions of OKLA. CONST. art. X, § 23 and OKLA. CONST. art. V, § 55 apply to funds made available to the State of Oklahoma through the State Fiscal Stabilization Fund of the ARRA. In general, these funds are made available to the states through an application process made by state governors and are awarded by the United States Department of Education. The funds are awarded to state governors in exchange for certain commitments and assurances made on behalf of the state.
Under the Oklahoma Constitution, the Legislature has the responsibility of making appropriations and raising sufficient revenues to fund such appropriations. State ex rel. Phillips v. Carter,99 P.2d 1025, 1028 (Okla. 1940). Article 55 of Section 5 of the Oklahoma Constitution provides in pertinent part:
 No money shall ever be paid out of the treasury of this State, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law. . . .
Id. (emphasis added). This provision is a limitation on the Legislature's exercise of its control over money in the state treasury, state funds or any funds under the management of the State. Section 55 does not apply to funds over which the State has no power or control.
In In re Department of Transportation, 646 P.2d 605 (Okla. 1982), the Oklahoma Supreme Court was confronted with the question of whether funds from the National Railroad Revitalization and *Page 3 
Regulatory Act of 1976, when deposited, became State funds subject to OKLA. CONST. art. X, § 15.[1] The court held:
 Federal money deposited in the state treasury pursuant to some grant-in-aid program is held in trust for a specific purpose. Like other custodial funds, it retains its original legal character. The legislature wields no authority over such funds. It may not subvert congressional policy by diverting the money to another purpose. Once accepted by the state, federal funds stand burdened with a trust which follows them from the moment of the deposit.
Id. 609-10 (footnotes omitted).
The Supreme Court has also applied this interpretation of federal money in construing OKLA. CONST. art. V, § 55, and has noted that special funds and trust funds are not subject to legislative appropriation. See City of Sand Springs v. Dep't of Pub. Welfare,608 P.2d 1139, 1150 (Okla. 1980) (citation omitted) (stating constitutional provision requiring legislative "appropriations do not apply as to special funds devoted to special purposes"); State ex rel. Hawkins v.Okla. Tax Comm'n, 462 P.2d 536, 540 (Okla. 1969) (holding time limit provisions of OKLA. CONST. art. V, § 55 do not apply "to revenues levied and earmarked for a special purpose which have accrued in a special fund").
Other state courts have also held that custodial funds are not state monies. In Navajo Tribe v. Arizona Department of Administration,528 P.2d 623, 624 (Ariz. 1975), the Arizona Supreme Court held that "[c]ustodial funds are not state monies." Id. (citation omitted). The funds at issue were federal funds made available to the Navajo Tribe and two Arizona cities for job training and employment projects to be administered by the Arizona Department of Economic Security.Id. The Arizona Constitution gave "supreme power in matters of appropriations to the legislature." Id. The court interpreted this power to mean that "[t]he term `public funds' refers to funds belonging to the state and does not apply to funds for the benefit of contributors for which the state is a mere custodian or conduit." Id. at 625. The court stated:
 It is within the power of the legislature to make appropriations relating to state funds, but funds from a purely federal source are not subject to the appropriative power of the legislature.
Id. *Page 4 
In a similar case, the Colorado Supreme Court considered a number of different federal block grants to determine whether they were subject to the governor's veto of legislative appropriation. See Colo. Gen.Asssembly v. Lamm, 738 P.2d 1156 (Co. 1987). The court compared these block grants to previous categorical grants which involved a high degree of federal regulation and found these block grants fell between the extensive federal control represented by categorical grants and the absence of federal control represented by revenue sharing. Id. at 1159. The court stated:
 State involvement in many of the programs functions only as a conduit for funds that ultimately are received by the same entities that received them under the categorical programs. Where the regulations provide for additional state administrative decision-making, the relevant decisions either are identical to the ones made by executive officials under the categorical programs or are similar to those made by executive officials in state-funded programs.
Id. at 1167. The court ultimately concluded, "[T]he block grants [do] not include the unrestricted spending feature of the [previous] federal revenue sharing program." Id. at 1173. The federal statutes which authorized the grants specified the purposes the state was directed to accomplish with the money, the manner in which the purposes were to be accomplished, and the restrictions placed on the funds by the federal government. Id. The court found those funds were not subject to legislative appropriation. Id. at 1173-74.
The Oklahoma Supreme Court also used this analysis in considering Section 23 of Article X of the Oklahoma Constitution, known as the balanced budget provision. This provision requires that legislative appropriations be certified by the State Board of Equalization. OKLA. CONST. art. X, § 23(1). The Board is to certify the total amount of revenue accruing to the general revenue fund and to each special fund during the last preceding year to ensure that only available funds are appropriated. Id.
In Woods v. State Board of Equalization, 517 P.2d 430 (Okla. 1973), the court considered whether federal revenue sharing funds were properly included in the Board's estimate of available revenue. The court noted that the Federal Revenue Sharing Act of 1972 was not an allocation of revenues to the state for a specific purpose but was to be spent as determined by the Legislature. Id. at 432. "Each State is to provide for the expenditure of the funds received only in accordance with the laws and procedures applicable to the expenditure of its own revenues."Id. at 431. Therefore, the funds were subject to appropriation under OKLA. CONST. art. V, § 55, and inclusion in the State Board of Equalization's estimate pursuant to OKLA. CONST. art. X, § 23.
In Attorney General Opinion 00-47, we applied this analysis in determining whether the Oklahoma Employment Security Commission had authority, under Oklahoma law, to expend Workforce Investment Act block grant funds without state legislation. The Workforce Investment Act set forth "in detail the manner in which grant funds are to be allocated among states and within states." Id. at 211(citing 29 U.S.C. §§ 2862,2863 (1999)). We concluded that "[w]hether federal funds are required to be appropriated pursuant to Article V § 55 depends upon the nature of the funds; that is *Page 5 
whether they are unrestricted, such as federal revenue sharing funds, or are custodial or trust funds." Id. at 214. We distinguished federal block grant funds from federal revenue sharing funds, which are to be expended in the same manner as a state's own revenue. Id. at 213. We concluded the federal block grant funds under the Workforce Investment Act Block Grant were custodial rather than unrestricted and thus not subject to the constitutional provisions requiring the appropriation of state funds. Id. at 218.
Pursuant to these authorities, if the federal government retains significant control over funds allocated to a state, the funds are considered custodial and the state constitutional provisions governing legislative appropriations do not apply. It is, therefore, necessary to determine the nature of the funds made available to Oklahoma pursuant to the State Fiscal Stabilization Fund, Title XIV of the ARRA.
 III. THE FEDERAL GOVERNMENT MAINTAINS SIGNIFICANT CONTROL OVERTHE FUNDS MADE AVAILABLE TO THE STATES BY THE STATE FISCAL STABILIZATION FUND, TITLE XIV, SECTIONS 14001 THROUGH 14013 OF THEARRA.
The portion of the ARRA about which you ask, the State Fiscal Stabilization Fund (Pub.L. No. 111-5, 123 Stat. 115, tit. XIV, §§ 14001 — 14013 [hereinafter Title XIV]), allocates funds totaling $53.6 billion to be administered by the United States Department of Education. Of these funds $5 billion is to be used for state incentive grants and an innovation fund. Id. § 14001(c). The remaining funds are in the form of federal grants to state governors, 61 percent on the basis of the state's relative population of individuals aged 5 through 24, and 39 percent on the basis of the state's relative total population.Id. § 14001(d), (e). Governors are to return to the Secretary of Education any funds received "that the Governor does not award as subgrants or otherwise commit within two years of receiving such funds, and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (d)." Id. § 14001(f).
The federal government maintains significant control over these funds, including reporting requirements by state recipients and evaluations of certain programs by the Comptroller General of the United States.See id. §§ 14008 — 14010.
The State Fiscal Stabilization Fund is divided into two funds, the Education Stabilization Fund and the Government Services Fund.Id. § 14002(a), (b). These funds contain essentially four programs; (1) state incentive grants, (2), innovation fund grants, (3) funds for early education and higher education, and (4) funds for general education and/or other services. See id. § 14005(c), (d); § 14006(b), (c).
Each of the four programs is described in Title XIV of the ARRA. State incentive grants (Section 14006) are given to states to achieve equity in teacher distribution, improve data collection, enhance the quality of academic assessments and support struggling schools as described in Section 14005(d) (2), (3), (4), and (5). State governors submit an application for consideration which must meet certain requirements.Id. § 14005(c). The Secretary of Education determines "which States receive *Page 6 
grants under this section, and the amount of those grants." Id.
§ 14006(b). "Each State receiving a grant under this section shall use at least 50 percent of the grant to provide local educational agencies in the State with subgrants. . . ." Id. § 14006(c).
The innovation fund, discussed in Section 14007, consists of funds available for academic achievement awards for eligible entities.Id. § 14007(a)(2). The term "eligible entities" is defined to mean, "(A) a local educational agency; or (B) a partnership between a nonprofit organization an[d] — (i) one or more local educational agencies; or (ii) a consortium of schools." Id. § 14007(a)(1). To be eligible for such an award, an eligible entity must meet the conditions described in Section 14007(b) relating to achieving certain objectives. The awards are given to allow eligible entities "to expand their work and serve as models for best practices; . . . to work in partnership with the private sector and the philanthropic community; and . . . to identify and document best practices that can be shared, and taken to scale based on demonstrated success." Id. § 14007(a)(3)(A), (B), (C). These funds are not awarded through gubernatorial application to be used by the state as other funds are, but are awarded to non-state entities.
The bulk of the State Fiscal Stabilization Fund is for the support of early education and higher education. Of the funds allocated, the Governor is to use 81.8 percent "for the support of elementary, secondary, and postsecondary education and, as applicable, early childhood education programs and services." Id. § 14002(a)(1). The Governor is to first use the funds to provide the amount of funds needed:
 (I) to restore, in each of fiscal years 2009, 2010, and 2011, the level of State support provided through such formulae to the greater of the fiscal year 2008 or fiscal year 2009 level; and
 (II) where applicable, to allow existing State formulae increases to support elementary and secondary education for fiscal years 2010 and 2011 to be implemented and allow funding for phasing in State equity and adequacy adjustments, if such increases were enacted pursuant to State law prior to October 1, 2008.
Id. § 14002(a)(2)(A)(i). The Governor shall also use the funds:
 ii. to provide, in each of fiscal years 2009, 2010, and 2011, the amount of funds to public institutions of higher education in the State that is needed to restore State support for such institutions (excluding tuition and fees paid by students) to the greater of the fiscal year 2008 or fiscal year 2009 level.
Id. § 14002(a)(2)(A). Remaining funds may be used "to provide local educational agencies in the State with subgrants based on their relative shares of funding under part A of title I of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6311 et seq.) for the most recent year for which data are available." Id. § 14002(a)(3). Section 14003 places restrictions on the use of the funds by *Page 7 
local educational agencies. Section 14004 restricts the use of funds by public institutions of higher education.
To access these funds, state governors must file an application with the Department of Education providing assurances that the state will commit to advancing education reform in five specific areas:
 (1) MAINTENANCE OF EFFORT. . . .
 (2) ACHIEVING EQUITY IN TEACHER DISTRIBUTION. . . .
 (3) IMPROVING COLLECTION AND USE OF DATA. . . .
 (4) STANDARDS AND ASSESSMENTS . . . [; and]
 (5) SUPPORTING STRUGGLING SCHOOLS.
Id. § 14005(d). See U.S. Department of Education, Application forInitial Funding under the State Fiscal Stabilization Fund Program, http://www.staterecovery.org/Websites/staterecovery/Images/ SFSF%20Application%20for%20Initial%20Funding.pdf (last visited June 6, 2009) [hereinafter Application for Initial Funding]. The application must also "provide baseline data that demonstrates the State's current status in each of the areas described in such assurances; and describe how the State intends to use its allocation" under both funds. Title XIV, § 14005(b)(2), (3).
As shown by the above statutory recitations, the funds available to the states are designated by the ARRA to be used for specific purposes. One fund, the Government Services Fund, provides more flexibility to the states in determining the purpose for which the funds are to be used.Id. § 14002(b). That provision reads:
 (1) The Governor shall use 18.2 percent of the State's allocation under section 14001 for public safety and other government services, which may include assistance for elementary and secondary education and public institutions of higher education, and for modernization, renovation, or repair of public school facilities and institutions of higher education facilities, including modernization, renovation, and repairs that are consistent with a recognized green building rating system.
Id. (emphasis added). While the Governor has the ability to determine the specific expenditure of these funds, the funds must be used for "public safety and other government services." Id. States must apply to the Department of Education for these funds. In the Application forInitial Funding, states must provide preliminary estimates of the percentage of the Government Services Fund that the state intends to spend under various broad categories. See id. at 10. As with other funds, states must submit a report to the Secretary of the Department of Education that meets certain conditions prescribed by Section 14008 of the ARRA. Not less than six months after submission of state reports, "[t]he Secretary shall submit a report to the Committee on Education and Labor of the House of Representatives, the Committee on Health, Education, Labor, and Pensions of the Senate, and the Committees on Appropriations of the House of Representatives and of the Senate." tit. XIV, *Page 8 
§ 14010. That report must evaluate the information provided in the state reports and the information required by Section 14005(b)(3) pertaining to how the state intends to use its allocation. Id.
Based on the restricted nature of the funds, we conclude that the funds available to the State of Oklahoma under Title XIV are custodial in nature. The federal government exercises significant control over the funds, determining through an application process whether the states are to be allotted funds and determining the amount of such funds to be allotted. The federal government specifies the purpose for which the funds are to be used. The federal government maintains strict reporting requirements and, as to the state incentive funds, provides that the Comptroller General of the United States shall conduct evaluations of the programs which shall include certain criteria. See Title XIV, §§ 14008, 14009. These funds are not unrestricted state funds so as to be governed by the provisions of OKLA. CONST. art. X. § 23 and OKLA. CONST. art. V, § 55. Therefore, we conclude the funds in the State Fiscal Stabilization Fund are custodial funds which may be expended without adherence to these constitutional provisions.
 IV. THE TENTH AMENDMENT TO THE UNITED STATES CONSTITUTION DOES NOT PREVENT CONGRESS FROM EXERCISING ITS CONSTITUTIONAL SPENDING POWERS AND DOES NOT PROHIBIT CONGRESS FROM CONDITIONING THE RECEIPT OF FEDERAL FUNDS ON COMPLIANCE WITH FEDERAL DIRECTIVES.
You also ask whether the ARRA violates the Tenth Amendment to the United States Constitution, because it does not provide for formal appropriation of the allocated monies through the appropriations process. The Tenth Amendment is a limitation on Congress' power in general and is not dependent on the nature of the funds. Thus, our conclusion that the funds are custodial in nature does not answer the question of whether there is a violation of the Tenth Amendment. The proper question with regard to the Tenth Amendment is whether the federal government has encroached upon the state's sovereignty by acting in an area that has been reserved to the state. The Tenth Amendment provides:
 The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.
U.S. CONST. amend. X. The United States Constitution also contains a Spending Clause which provides:
 The Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States[.]
U.S. CONST. art. I, § 8, cl. 1. The Tenth Circuit Court of Appeals has explained the interplay between these two provisions, stating, "if the authority to act has been delegated by the Constitution to *Page 9 
Congress, then it may act pursuant to Article I; if not, the power has been reserved to the states by the Tenth Amendment." Kansas v.United States, 214 F.3d 1196, 1198 (10th Cir. 2000).
In 1987, the Supreme Court upheld a federal law directing the Secretary of Transportation to withhold federal highway money from states that refused to raise their legal drinking age to 21. SouthDakota v. Dole, 483 U.S. 203, 207 (1987). The Court first acknowledged that "Congress may attach conditions on the receipt of federal funds."Id. at 206. The Court recognized four restrictions on Congress' power under the Spending Clause. First, the object of Congress "must be in pursuit of `the general welfare.'" Id. at 207. Second, the conditions placed upon the state's receipt of federal funds must be unambiguous, such that the states know the consequences of their decision to participate. Id. Third, the conditions must be related to the federal interest in the particular program. Id. Fourth, there can be no independent constitutional bar to the conditions. Id. at 208.
In discussing this fourth factor, the Court stated that theTenth Amendment itself does not act as a constitutional bar. Id. at 210. This restriction stands for the more general proposition that Congress may not "induce the States to engage in activities that would themselves be unconstitutional." Id. Applying this test to the funds available under the State Fiscal Stabilization Fund of the ARRA shows that Congress acted properly pursuant to its spending powers in conditioning the receipt of federal money on certain factors. Under the process implemented, the ARRA requires state governors to complete a lengthy application for receipt of the funds. Title XIV, § 14005(c). ThisApplication for Initial Funding, as well as the Act itself, lists the restrictions placed on the use of the funds and requires the governors to make assurances as to how the funds will be spent. Id. § 14005(b)(2), (3); (d); see also Application for Initial Funding at 10. The ultimate receipt of the funds is dependent on voluntary acceptance of the terms. Section 1607(a) of Pub.L. No. 111-5, 123 Stat. 115, tit. 16 requires that:
 Not later than 45 days after the date of enactment of this Act, for funds provided to any State or agency thereof, the Governor of the State shall certify that: (1) the State will request and use funds provided by this Act; and (2) the funds will be used to create jobs and promote economic growth.
Id. If funds are not accepted by the Governor, the state legislature is to adopt a concurrent resolution accepting the funds. Id. § 1607(b).
First, the "general welfare" test is easily met, as one of the stated purposes of the ARRA is to "preserve and create jobs and promote economic recovery." ARRA, Pub.L. No. 111-5, 123 Stat. 115, § 3(a)(1). This is clearly in pursuit of the "general welfare." Second, the conditions placed upon the funds in Sections 14001 through 14013 are clear and unambiguous. Third, the conditions are related to the federal interest in economic recovery. Finally, we have found above that the provisions of the Oklahoma Constitution relating to appropriations and certification of funds are not violated by the ARRA. We are aware of no other constitutional impediments. Thus, there is no independent constitutional bar to the conditions. *Page 10 
Courts have rejected the general notion that Congress cannot condition the receipt of federal funds on compliance with certain directives. InPennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17 (1981), the Supreme Court emphasized that when Congress placed conditions on the receipt of federal funds, "it must do so unambiguously." Id. The Court explained that a law that conditions an offer of federal funding on a promise by the recipient is essentially a contract between the Government and the recipient of funds. Id. "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the `contract.'"Id.
Thus, the Tenth Amendment to the United States Constitution does not stand as a bar to receipt of the federal funds under the State Fiscal Stabilization Fund, Title XIV, Sections 14000 through 14013 of the ARRA.
It is, therefore, the official Opinion of the Attorney Generalthat:
 1. Funds made available to the State of Oklahoma from the State Fiscal Stabilization Fund, Title XIV, Sections 14000 through 14013 of the American Recovery and Reinvestment Act of 2009 ("ARRA"), Pub.L. No. 111-5, 123 Stat. 115, tit. XIV (2009), are custodial funds as the federal government places restrictions on their use and maintains significant control over them.
 2. As the monies made available from the State Fiscal Stabilization Fund, Sections 14000 through 14013 of the ARRA, are custodial in nature rather than unrestricted, the direct allocation of these monies does not violate the provisions of OKLA. CONST. art. V, § 55, which requires legislative appropriation, or OKLA. CONST. art. X, § 23, which requires certification of funds as available for expenditure by the State Board of Equalization.
 3. The direct allocation of monies from the State Fiscal Stabilization Fund, Sections 14000 through 14013 of the ARRA, does not violate the Tenth Amendment to the United States Constitution as the federal government has the authority to make such expenditures through the Spending Clause, U.S. CONST. art. I, § 8, cl. 1, and may condition the receipt of federal money on compliance with federal directives. Pennhurst State Sch. Hosp. v. Halderman, 451 U.S. 1, 17 (1981).
W.A. DREW EDMONDSON OKLAHOMA ATTORNEY GENERAL
SANDRA D. RINEHART SENIOR ASSISTANT ATTORNEY GENERAL
[1] The terms of OKLA. CONST. art. X, § 15(A) provide, "[t]he credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or association, municipality, or political subdivision of the State." *Page 1