W. Lynne DRAPER, Petitioner,

v.

The STATE BOARD OF EQUALIZATION,
and Henry Bellmon, Governor of the State
of Oklahoma, A. F. Shaw, State Auditor,
Cowboy Pink Williams, State Treasurer,
James M. Bullard, Secretary of State,
Charles Nesbitt, Attorney General, John M.
Rogers, State Examiner and Inspector, and
Lew Meibergen, President of the State
Board of Agriculture, individually and as
members of and constituting the State
Board of Equalization, Respondents.

No. 41336.

Supreme Court of Oklahoma.

May 10, 1966.

Walker, Lawrence & Harris, Oklahoma City, Wm. F. Latting, Tulsa, for petitioner.

Charles Nesbitt, Atty. Gen., for respondents.

JACKSON, Vice Chief Justice.

This proceeding was filed as an original action in this Court on January 4, 1965, wherein petitioner, W. Lynne Draper, prayed for writs of prohibition and mandamus to require the State Board of Equalization and its members to make and file an estimate of revenues available for appropriation by the Legislature during the legislative session beginning January 5, 1965. The contention was made that the estimate of revenues available for appropriation by the Legislature during the next biennium, as shown in the Board's estimate dated December 2, 1964, did not comply with Article 10, Section 23, Oklahoma Constitution.

After hearing argument we concluded that the questions raised were most important and that briefing and the preparation of an opinion would consume such an amount of time as to place impossible burdens of uncertainty upon the Governor and the Legislature in determining the amount of revenues available for appropriation during the next biennium. Because of the importance of the questions presented, we reserved judgment as to the merits of plaintiff's petition and whether we should at a later date assume jurisdiction.

The cause has now been fully briefed and argued and we have concluded that there is

merit in plaintiff's petition and we accordingly assume jurisdiction.

Recorded decisions of this Court disclose that "budget balancing" in this State constituted a problem as early as 1911, which continued unabated until 1941. In re Application of State to Issue Bonds, etc., 33 Okl. 797, 127 P. 1065; Davis v. Childers, 181 Okl. 468, 74 P.2d 930; Schmoldt v. Bolen, 183 Okl. 191, 80 P.2d 609; and In re State Treasury Note Indebtedness, 185 Okl. 10, 90 P.2d 19.

By 1941 the State's indebtedness had grown to such proportions that the Legislature determined that a constitutional amendment was necessary. In House Joint Resolution No. 10 (S.L.1941, p. 547), the Legislature approved and referred to a vote of the people, the constitutional amendment which, when adopted in 1941, changed Article 10, Section 23, Oklahoma Constitution, so that it provides in part as follows:

" * * * prior to the convening of each regular session of the Legislature, the State Board of Equalization shall make an itemized estimate of the revenues to be received by the State under the laws in effect at the time such estimate is made for each year of the next biennium showing separately the revenues to accrue to the credit of the General Revenue Fund and each special fund of the State, and the total amount of such estimate for each fiscal year shall not exceed the average total revenue which accrued to each such fund for the three (3) last preceding fiscal years, to which amount shall be added the cash surplus, if any, from the preceding fiscal year in the hands of the State Treasurer to the credit of any such fund and not previously appropriated by the State Legislature at the time such estimate is made. * * * and all appropriations made in excess of such estimate shall be null and void; Provided, However, that the Legislature may at any regular session or special session called for that purpose, enact laws to provide for additional revenues, other than ad valorem taxes, or transferring the existing revenues or surpluses from one fund to another, whereupon it shall be the duty of the State Board of Equalization to make an estimate of the revenues that will accrue under such laws * * *, and the amount of any increase or decrease, resulting, for any reason, from such laws shall be added to or deducted from each respective fund, as the case may be. The amount of such adjusted estimate shall be the maximum amount which can be appropriated for all purposes from any fund for each year.

" * * * "

It is noticed that the "estimate" to be made by the Board prior to the convening of the Legislature is clear and explicit. The Pre-legislative Session "estimate" is not really an estimate but is a formula by which the revenues to be received during the next biennium may be reduced to a mathematical certainty.

However, as disclosed by Section 23, the Legislature was authorized during its legislative session in 1965 to enact laws to provide for additional revenue and for transferring existing revenues or surpluses from one fund to another. When the Legislature provided for additional revenue, as it did in 1965, the Board was then required to make an (adjusted) estimate of the revenues that would accrue by reason of such new taxes. This was done in the instant case by the Board on June 11, 1965.

■ The method provided in Section 23 for estimating maximum revenues to be received during the next biennium is exclusive and binding upon the Board and the Legislature. This necessarily must be true because the section provides in part: "all appropriations made in excess of such estimate shall be null and void" and "The amount of such adjusted estimate shall be the maximum amount which can be appropriated for all purposes from any fund for each year."

■ From Section 23 it is clear that when the Board made its estimate on December 2, 1964, it was not authorized to anticipate

any surplus revenues would accrue in the General and special funds during the current fiscal year (1964–1965) nor to anticipate any surplus revenues would accrue during the next biennium (July 1, 1965–June 30, 1967). These items are not within the formula and may not be included within the estimate.

■ As above noticed, Section 23 was adopted in 1941. Article 10, Section 23a was adopted in 1944, and to a limited extent, enlarges the Legislature's (but not the board's) powers. In the last sentence thereof, it provides that "any surplus monies * * * to the credit of the State General Revenue Fund shall be subject to appropriation by the Legislature." This means that if any surplus revenues actually accrued during the fiscal year 1964–1965 prior to the Legislatures' adjournment in 1965, the Legislature could ascertain the amount and make appropriations against it.

Section 23, supra, also provides that "Revenues deposited in the State Treasury to the credit of the General Revenue Fund or of any special fund, (which derives its revenue in whole or in part from State taxes or fees) shall * * * be allocated monthly to each department, institution, board, commission or special appropriation on a percentage basis, in that ratio that the total appropriation for such department * * * for that fiscal year bears to the total of all appropriations from each fund for that fiscal year, and no warrant shall be issued in excess of said allocation." Obviously, since the incoming revenues of a fiscal year are committed on a monthly basis to finance the outstanding appropriations to the various departments there will be little or no surplus revenues in the General or special funds until near the end of a fiscal year.

■ Our attention is invited to the Emergency Appropriation Fund which was created by the Legislature in 1947. 62 O.S. 1961, Secs. 9.1–9.8. It is argued that the Emergency Appropriation Fund may be treated as a "special fund" under Section 23, Constitution, supra. This argument is untenable. Special funds, in the contemplation of Section 23, include only those funds that are supported by direct taxes, fees or other revenue. The Emergency Appropriation Fund consists of "all moneys transferred, or authorized to be transferred, by the Legislature from any surplus cash arising incidentally from receipts in excess of appropriations to the credit of other funds in the State Treasury." 62 O.S. 1961, Sec. 9.2. In other words, accruals in the Emergency Appropriation Fund are not revenue, but such fund is simply a convenient account in which to transfer surplus funds from the General and Special Funds not needed to pay current year appropriations. In this connection it is significant that the same Legislature which submitted Section 23 (Constitution), supra, for adoption by the people, concluded that surplus funds are a part of the General Revenue Fund. In 62 O.S.1941, Sec. 8.6, it was provided that unencumbered balances "shall be transferred by the State Auditor to a surplus fund, which is hereby created as a part of the General Revenue Fund."

When the Board made its estimate on December 2, 1964, it included, or should have included, in its estimate the average total revenue which accrued to the General and special funds for the three last preceding fiscal years. This necessarily included the average total surplus revenues which accrued during that period. If we now treat the Emergency Appropriation Fund as a "special fund" under Section 23, and utilize the three year average of transfers to that fund in making the estimate, we would be using the surplus revenue twice to boost appropriations during the next biennium.

■■ It is further argued that 62 O.S. 1961, Sec. 9.6 (enacted in 1947), specifically requires the Board to make an estimate of the revenue that will accrue in the Emergency Appropriation Fund during the last year (1964–1965) of the current biennium, and that such estimated revenue is a proper item to be included in the Board's estimate. This argument is based upon the well rec-

ognized principle that the Legislature exercises the State's sovereign will unless restrained by constitutional provisions. The argument overlooks the fact that Section 23, supra, provides an exclusive formula for making the estimate and the Legislature is not authorized to expand or enlarge the formula. Section 23 provides that *surplus cash* from the preceding fiscal year shall be included in the estimate; it makes no provision for estimating surplus revenue to accrue in the current biennium. However, since Section 23a authorizes the Legislature to appropriate any *surplus monies* to the credit of the General Fund, we know of no reason why the Legislature may not have the assistance of the Board in determining the amount of any actual surplus at any suggested date during the current biennium whether in the General Revenue Fund or in the Emerg .cy Appropriation Fund.

In summarizing what we have said, the Board's December, 1964, estimate should have been limited to the following:

1. Revenue separately expected to accrue to the General Revenue Fund and to each of the special funds of the State during the first year of the next biennium (limited to the three year average as to each such fund).

2. Revenue separately expected to accrue to the General Revenue Fund and to each of the Special funds of the State during the second year of the next biennium (limited to the three year average as to each such fund).

3. The cash surplus from the preceding fiscal year in the hands of the State Treasurer to the credit of the General Revenue and Special Funds not previously appropriated by the Legislature at the time such estimate was made.

In its June 11, 1965, adjusted estimate the Board should have added the following:

1. Revenues expected to accrue during the fiscal year ending June 30, 1966, by reason of the new tax increase.

2. Revenues expected to accrue during the fiscal year ending June 30, 1967, by reason of the new tax increase.

3. Any surplus monies to the credit of the State General Revenue Fund, if requested by the Legislature, as of June 11, 1965.

No useful purpose could now be served by the issuance of writs of prohibition and mandamus. However, in future estimates we are confident that the Board will comply with the views as herein expressed, and especially so since the minutes of the Board meeting held on December 2, 1964, disclose that some members of the Board entertained serious doubts that the "item of estimated surplus, often referred to as anticipated surplus" was a proper item "against which the Legislature may make appropriations."

■ Our decision herein has been reached solely upon the facts and arguments presented in this case. In this connection it is to be noticed that the facts in this case do not disclose that any new revenue raising measures were adopted during the three-year period ending June 30, 1964. However, when the Board makes its pre-legislative session esimate in 1966, prior to the convening of the Legislature in 1967, a new question will arise which is not now present and has not been raised by the parties. We refer to the fact that in 1965, the Legislature increased the cigarette tax which, according to the adjusted estimate filed on June 11, 1965, will increase the state revenue at the rate of $2,600,000 per year. When the average total revenue which accrued during the last three preceding fiscal years is determined in December, 1966, if the $2,600,000 is included in the "formula" and divided by three (years) then it is apparent that only ⅓rd of that new revenue from the increased cigarette tax will be available for appropriation in each year of the next biennium, whereas the Board, having had one year of experience (1965–1966) to determine the exact amount that the increased cigarette tax will raise should be authorized to anticipate that an equal amount will be collected in

each year of the next biennium. Therefore, it seems to us that if the new revenue from the cigarette tax is not included in the three-year average ending June 30, 1966, it may be included as a separate item for each year of the next biennium in an amount equal to the collections from that source during the fiscal year 1965–1966. This conclusion is consistent with the over-all purpose of Article 10, Section 23, Constitution (living within revenues), and is within the principle of "mathematical certainty." In this view the revenue from the increased cigarette tax is new or additional revenue in the contemplation of Section 23, supra.