**William J. WISEMAN, Jr., Petitioner,**

**v.**

**David Lyle BOREN, Governor of the State of Oklahoma, et al., Respondents.**

**No. 49087.**

Supreme Court of Oklahoma.

Jan. 8, 1976.

Supplemental Opinion on Rehearing Jan. 26, 1976.

Rehearing Denied Feb. 10, 1976.

Jane P. Wiseman, Wm. F. Latting, Tulsa, for petitioner.

Larry Derryberry, Atty. Gen., Mike D. Martin, Asst. Atty. Gen., Oklahoma City, for respondents.

James E. Hamilton, Poteau, pro se, and as a Member of the Oklahoma State Senate.

Fagin, Hewett, Mathews & Fagin by Arnold D. Fagin, Oklahoma City, for the Okl. Ed. Ass'n amicus curiae.

Glenn O. Young, Sapulpa, pro se, and for the Oklahoma Landowners Protective Ass'n, amicus curiae.

BARNES, Justice:

This is an application for this Court to assume original jurisdiction and issue writ of prohibition to prohibit Respondents from transferring further surplus from the State's General Revenue Fund to a Sinking Fund for the purpose of retiring State bonds without prior legislative appropriation.

Petitioner's request stems from an announcement by Respondent, Governor David Lyle Boren, that he had ordered the transfer of $80,265,824.66, representing surplus funds that had accrued to the State Treasury as of June 30, 1975, from the General Revenue Fund of the State to a Sinking Fund purported to be created by Article 10, § 23a, for use in retiring the outstanding and unpaid bonded indebtedness of the State of Oklahoma.

At the present time, the $80,265,824.66 in surplus funds has been transferred from the General Revenue Fund to certain sinking funds, but none has yet been paid out of the Treasury to retire any of the State's General obligation bonds.

The question before this Court is whether Respondents may constitutionally pay out the transferred funds without prior legislative appropriation in order to retire State bonds.

The cause has now been fully briefed and argued. We have concluded that this is a matter of great public concern. Accordingly, we assume jurisdiction.

While we are concerned with applying Art. 10, § 23a, as adopted in 1944, we must be cognizant of other related constitutional provisions. The movement for eliminating deficit spending in our State government started in 1941 with the submission and adoption of the so-called budget-balancing amendment by the Phillips administration.

During the war years the State's revenues flourished. It became apparent that the then outstanding State bonds could be paid off within a short time. The Governor and the Legislature decided to submit, by vote of a special legislative session, a constitutional amendment dealing with the subject. That amendment, when approved by the people on July 11, 1944, became Article 10, § 23a, which reads:

"Any surplus which has accrued or may hereafter accrue to the General Revenue Fund of the State of Oklahoma during any fiscal year shall be placed monthly in a sinking fund in the State Treasury to be used solely for the purpose of paying the principal and interest of the outstanding and unpaid bonded indebtedness of the State of Oklahoma. The monies and securities heretofore credited to the Surplus Accounts of the State Funding Bond Funds of 1935, 1939, and 1941 also shall be placed in said Sinking Fund. The State Treasurer shall be the custodian of said Sinking Fund and shall apply the monies and securities placed to the credit of said fund to the payment of the principal and interest of the state's bonded indebtedness. The State Treasurer with the approval

of the Governor and Attorney General shall have the authority to invest the monies in said sinking fund in bonds or securities of the United States of America, and the State Treasurer with the approval of the Governor and Attorney General may sell said securities to provide funds to meet maturing State bonds and coupons. The provisions of this section shall be self-executing. *When the monies credited to said sinking fund together with the monies set aside to pay said bonded indebtedness, pursuant to the statutes authorizing the issuance of said bonds, are sufficient to pay all outstanding bonds and coupons heretofore issued by the State of Oklahoma, it shall no longer be necessary to credit surplus funds to the Sinking Fund herein created.* The sufficiency of said monies to fully pay the State's bonded indebtedness shall be determined by the Governor, State Treasurer, and Attorney General. After such determination any surplus monies thereafter to the credit of the State General Revenue Fund shall be subject to appropriation by the Legislature." (Emphasis ours)

By these terms the people elected to dedicate a sufficient amount of the recurring General Revenue Fund surpluses into a Sinking Fund from which the 1935, 1939, and 1941 Funding Bonds could be retired. Petitioner argues that the executive and legislative intent was to safeguard the diminution of the last vestige of deficit financing in Oklahoma (as embodied in the 1935, 1939, and 1941 Funding Bonds), and that as § 23a functioned as an appropriation in 1944 then it ceased to have any further effect in 1945 (by its own terms) when its declared purpose was fulfilled. On the other hand, Respondents urge that in the enactment of § 23a the Legislature and the people of Oklahoma established not a temporary measure but a new, continuing fiscal policy that would prevent the State from ever operating at a deficit by requiring the State bonded debt to be paid off out of surplus funds in order to maintain a balanced fiscal position. Respondents contend that it would be ridiculous for the Governor and the Legislature to submit, and for the people to enact, a constitutional provision which would be in effect only ten months, until 1945, when it was determined by the Governor, the State Treasurer, and the Attorney General that sufficient monies had been accumulated in the Sinking Fund to pay off the 1935, 1939, and 1941 Funding Bonds.

It seems to us that Respondents' argument is refuted by the fact that although the certificate was issued May 29, 1945, as shown by the Certificate of Sufficiency issued by the Governor, State Treasurer, and the Attorney General, as above noted, which was some ten months after the July 11, 1944, enactment of § 23a, the records reflect that the bonds were not actually paid off until 1950 or perhaps later. There was, then, definite reason for protecting the surplus funds set aside for that purpose against possible appropriation by Legislators mindful of the needs for State services and the wishes of their constituents that these services be provided.

We conclude, as a result of applying the established canon of construction set out in *Shaw v. Grumbine*, 137 Okl. 95, 278 P. 311 (1929), which directs us to give effect to the clear meaning of unambiguous language, that the Petitioner's contention that Art. 10, § 23a, became functus officio when the last of the Refunding Bonds were paid off is correct. We are impressed by the specific statement that when "the monies credited to said sinking fund together with the monies set aside to pay said bonded indebtedness, pursuant to the statutes authorizing the issuance of said bonds, are sufficient to pay all outstanding bonds and coupons heretofore issued by the State of Oklahoma, it shall no longer be necessary to credit surplus funds to the Sinking Fund herein created." The words *"all outstanding bonds and coupons heretofore issued"* (emphasis supplied) certainly speak in terms of the past, not of the future. It *"shall no longer be necessary* to

credit surplus funds to the Sinking Fund herein created" (emphasis supplied) certainly has the connotation "not any more", or "never again". Future operation of the amendment seems to us to be negated by these words. It is to be noted that on the ballot title by which Art. 10, § 23a, was submitted to the people, they were asked to vote "Yes" or "No" on a proposition stating, in significant part, "providing when sufficient monies have accumulated to pay all outstanding bonds and coupons *heretofore issued* by the State, surplus monies thereafter to the credit of the General Revenue Fund *may be appropriated* by the Legislature" (emphasis supplied). The ballot title in using the words "heretofore issued" surely referred only to the outstanding bonds existing up to that time. We think that, at this late date, it would be improper to frustrate what clearly must have been the intention of the electors who voted in the affirmative upon a proposed amendment so clearly phrased to indicate a time limit for its effectiveness, and submitted to them upon a ballot so clearly indicating the same effect.

A number of other factors confirm our interpretation of this constitutional provision. In the first place, we take notice that on May 29, 1945, the Governor, the State Treasurer, and the Attorney General issued a certificate, in compliance with Art. 10, § 23a, reading, in significant part, as follows:

"WHEREAS, it appears that there is now on hand and in the custody of the State Treasurer sufficient monies and United States government securities to pay at maturity the principal and interest on all of the State's outstanding bonded indebtedness, and that the interest to be derived from said securities will be more than the amount necessary to pay the fiscal agency fees which are required to be paid to the fiscal agency by the State at the times the state bonds and coupons are paid and retired;

"NOW, THEREFORE, ROBERT S. KERR, THE GOVERNOR OF OKLA-HOMA, A. S. J. SHAW, STATE TREASURER, AND RANDELL S. COBB, ATTORNEY GENERAL, do hereby make and certify the following determinations:

"1. That there are now on hand and in the custody of the State Treasurer sufficient monies to pay and retire the bonds and coupons of the State of Oklahoma which mature on or before June 30, 1945.

"2. That the total amount of principal and interest of the State's bonded indebtedness due and maturing after June 30, 1945, is $26,582,525.21.

"3. That the total amount of monies which have been placed in the State Sinking Fund to retire the principal and interest of the bonds of the State of Oklahoma due and maturing after June 30, 1945, is $26,582,525.21; that $17,079,000.00 of said monies have been invested in United States government securities as authorized by Section 23-a, Article 10, Oklahoma Constitution, and that there is now on hand in cash in said Sinking Fund in the custody of the State Treasurer in addition to said securities also in his custody the sum of $9,503,525.21; and that the interest which will be collected on the securities now held in said State Sinking Fund will more than take care of the State fiscal agency fees which are required to be paid by the State at the time the State's bonds and coupons are paid through the fiscal agency.

"4. That the monies credited to the State Sinking Fund referred to in Section 23-a, Article 10, Oklahoma Constitution, together with the monies set aside to pay the State's bonded indebtedness pursuant to the statutes authorizing the issuance of said bonds, are sufficient to pay all outstanding bonds and coupons heretofore issued by the State of Oklahoma at their maturities."

This constitutes a contemporaneous construction in favor of the reading which we

have given to Section 23a. Such a construction weighs heavily in determination of a document's meaning. *McCain v. State Election Board*, 144 Okl. 85, 289 P. 759 (1930), quoted with approval in *Hines v. Winters*, 320 P.2d 1114 (Okl.1957); *Leininger v. Ward-Beekman & Brooks, Inc.*, 139 Okl. 292, 282 P. 467 (1929). Moreover, this construction has been followed by subsequent Legislatures and State officers.

We would first note that the 1935 and the 1939 Funding Bonds were issued pursuant to Article 10, § 23, of the Constitution, prior to its amendment on March 11, 1941. The 1941 Funding Bonds were issued pursuant to § 23, as amended on March 11, 1941, which specifically authorized the Legislature to fund or refund the State debt arising prior to July 1, 1941. All of these bonds were issued by Legislative enactment, did not require approval by vote of the people, and funded or refunded deficits in State expenditures.

The bonds which the Respondents propose to retire were issued pursuant to Article 10, § 25, of the Constitution, which provides:

"Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law for some work or object, to be distinctly specified therein; and *such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people* and have received a majority of all the votes cast for and against it at such election. * * *" (Emphasis ours)

We take notice of the further fact that there has been a cash surplus in the General Revenue Fund at the close of each fiscal year since 1942. During the years from 1945 to 1975 no Governor, State Treasurer, Attorney General, court, legislator, bondholder, or any other person suggested that surpluses were required by Art. 10, § 23a, to be transferred to a Sinking Fund for the retirement of outstanding and unpaid bonds of the State.

The second syllabus of this Court's decision in *State v. State Election Board of Oklahoma*, 318 P.2d 422 (Okl.1957), states:

"2. The long and continued interpretation of a constitutional provision by acquiescence therein is an aid in removing doubt as to the meaning of such constitutional provision as intended by the framers thereof."

In *Cities Service Gas Co. v. Peerless Oil & Gas Co.*, 203 Okl. 35, 220 P.2d 279, affirmed 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190 (1950), this Court set forth the well-recognized rule:

"The construction placed on statutes or constitutional provisions by officers in the discharge of their duties, either at or near the time of the enactment, which has long been acquiesced in, is a just medium for their judicial interpretation."

Respondents argue that these rules of construction relate to statutory or constitutional provisions which are either doubtful or ambiguous and are subject to execution or discharge by certain officials. They assert the provision in § 23a requiring transfer of surplus funds monthly to the Sinking Fund is not a vague or ambiguous provision, and that its intent and meaning require only a plain reading. Respondents further contend that no official is charged with the duty of executing the transfer of surplus money and that the mandatory, self-executing transfer requires only a ministerial act to complete the process. We have already indicated that we do not consider the provision ambiguous, but that, in our opinion, its meaning is contrary to that propounded by the Respondents. Hence we regard the continuing practical construction given to § 23a as properly

supportive of the meaning thereof at which we have arrived.

In *Draper v. State Board of Equalization*, 414 P.2d 276 (Okl.1966), we stated, at page 277:

"Under Article 10, Sec. 23a, Oklahoma Constitution, the Legislature may make appropriations against surpluses actually existing in the State's General Revenue Fund for the current fiscal year (the fiscal year in which the Legislature convenes), even though the State Board of Equalization is not authorized under Art. 10, Sec. 23, to include such surpluses in its estimate."

And again, at page 279:

"As above noticed, Section 23 was adopted in 1941. Article 10, Section 23a was adopted in 1944, and to a limited extent, enlarges the Legislature's (but not the board's) powers. In the last sentence thereof, it provides that 'any surplus monies * * * to the credit of the State General Revenue Fund shall be subject to appropriation by the Legislature.' This means that if any surplus revenues actually accrued during the fiscal year 1964–1965 prior to the Legislature's adjournment in 1965, the Legislature could ascertain the amount and make appropriations against it."

The course outlined certainly would be improper, if § 23a automatically devoted surplus revenues to paying off the existent debt, which, we take notice, in 1965 amounted to over $68,000,000.00.

■ Article 10, § 23, of the Constitution has been amended from time to time. By the latest version, adopted July 22, 1975, there is a provision to the effect that "the Legislature may * * * enact laws to provide for * * * transferring the existing revenues or unappropriated cash on hand from one fund to another." This provision certainly is inconsistent with the idea that Article 10, § 23a, currently commands that unappropriated surpluses must be transferred automatically to a Sinking Fund for the retirement of existing bonded

indebtedness. Its date of enactment is subsequent to that of § 23a, so that, even upon Respondents' reading of that section, the provisions of § 23, as re-enacted in 1975, must supersede it.

■ For the above reasons, Writ of Prohibition is granted and Respondents are directed to refrain from taking any action to retire State bonds under Art. 10, § 23a, of the Constitution. We hold the subject $80,265,824.66 in surplus funds, having accrued to the General Revenue Fund as of June 30th, 1975, all or any part thereof, is available for immediate appropriation by the Legislature.

HODGES, V. C. J., and DAVISON, IRWIN, BERRY, LAVENDER, SIMMS and DOOLIN, JJ., concur.

WILLIAMS, C. J., dissents.

WILLIAMS, Chief Justice (dissenting).

I must respectfully dissent in this case. In my view, the Court's holding herein ignores the plain and unambiguous language of the first sentence of Article X, Sec. 23a. Under that sentence, *"Any* surplus which has accrued or *may hereafter accrue* to the General Revenue Fund of the State of Oklahoma *during any fiscal year* shall be placed monthly in a sinking fund in the State Treasury to be used *solely* for the purpose of paying the principal and interest of the outstanding and unpaid bonded indebtedness of the State of Oklahoma" (emphasis added).

In that sentence, the people of Oklahoma stated a fiscal policy which continues in full force and effect. It is not limited, either directly or by implication, to the retirement of the 1935, 1939 and 1941 Funding Bonds.

The provisions of Sec. 23a regarding those particular bonds are obviously *in addition to* the requirements of the first sentence. This is shown by the plain language of the second sentence, which provides that the Surplus Accounts of the bonds for those years *"also* shall be placed

in said Sinking Fund" (emphasis added). Without the second sentence, there might have been some question as to whether the existing statutory Surplus Accounts (which were not in the General Revenue Fund) should be transferred to the new sinking fund created by Sec. 23a.

I can find no room for doubt as to the meaning of this language. By its own terms, Section 23a in toto is self-executing. In the case now before us, the people of Oklahoma have written into our fundamental law, in language too clear to permit misunderstanding, the answer to the question of whether a legislative appropriation, or any other kind of legislative act, is necessary to carry into effect the provisions of Sec. 23a.

To my mind, no reasonable basis exists for asserting there has been either an administrative, legislative or judicial construction of Section 23a.

Under the doctrine of pari materia, I believe the treatment of the problem presented in *Draper v. State Board of Equalization* cited by the majority, related to any surplus remaining after payment of bonds or accumulation in sinking fund of sufficient funds as determined by the Governor and Treasurer and Attorney General, to pay them. That case is not applicable here.

The Legislature or the people could have achieved the result obtained by the enactment of Section 23a under the present interpretation thereof, by enacting a mere statute or initiated or referred measure as opposed to changing our fundamental law by constitutional amendment.

This Court has in effect added at the end of the first sentence the words "for the years 1935, 1939 and 1941." By its holding herein, this Court has in effect changed that sentence to read "The provisions of this section as to the 1935, 1939 and 1941 State Funding Bond Funds shall be self-executing."

I respectfully dissent.

## SUPPLEMENTAL OPINION ON REHEARING

IRWIN, Justice:

Intervenor, James E. Hamilton, individually and as a member of the Oklahoma State Senate, was authorized to intervene after our original opinion was promulgated. On Rehearing, he challenges our conclusion that all or any part of the $80,265,824.66 in surplus funds, which had accrued to the General Revenue Fund as of June 30, 1975, is available for immediate appropriation by the 1976 Legislature. Intervenor contends that no part of such surplus funds ($80,265,824.66) are presently available for appropriation by the 1976 Legislature and will not become so until revenues collected and the surplus are sufficient to satisfy all of the appropriation obligations of the 1975 Legislature for the current fiscal year ending June 30, 1976.

■ The issue before this Court is not whether all or any part of the surplus funds should be appropriated, but whether the Constitution prohibits the immediate appropriation of such funds by the 1976 Legislature. We may not consider the advisability of appropriating surplus funds because this Court will not usurp the prerogative exercised by the Legislature in making appropriations for state purposes. Whether all or any part of the surplus funds should be appropriated is within the discretion of the Legislature and not this Court, as the Constitution fixes upon the Legislature the responsibility of making appropriations. *State ex rel. Phillips v. Carter*, 186 Okl. 571, 99 P.2d 1025 (1940); and *Tate v. Logan*, Okl., 362 P.2d 670 (1961).

■ Even if our Constitution does not specifically authorize the immediate appropriation of the surplus funds by the 1976 Legislature, such funds are presently available unless our Constitution prohibits it. The Legislature exercises the sovereign will unless restrained by the Constitution *Draper v. State Board of Equalization*, Okl., 414 P.2d 276 (1966), and we look to

the Constitution to determine whether the Legislature is prohibited from doing an act rather than to see if it is authorized. If there is any doubt as to the Legislature's power to act in a given situation, the doubt should be resolved in favor of the validity of the action taken by the Legislature. Restrictions and limitations upon Legislative power are to be construed strictly, and are not to be extended to include matters not covered or implied by the language used. *Tate v. Logan, supra.* Any Legislative enactment (in this case the proposed appropriation of part or all of the 1975 surplus funds by the 1976 Legislature) will be presumed constitutional unless its unconstitutionality is shown beyond a reasonable doubt. *Schmitt v. Hunt*, Okl., 359 P. 2d 198 (1961).

In the "budget balancing" amendment to our Constitution, Article 10, § 23, adopted March 11, 1941, the State Board of Equalization (Board) was required:

> " * * * [to make] an itemized estimate of the revenues to be received by the State under the laws in effect at the time such estimate is made for each year of the next biennium showing separately the revenues to accrue to the credit of the General Revenue Fund and each special fund of the State, and the total amount of such estimate for each fiscal year shall not exceed the average total revenue which accrued to each such fund for the three (3) last preceding fiscal years, *to which amount shall be added the cash surplus, if any, from the preceding fiscal year in the hands of the State Treasurer to the credit of any such fund and not previously appropriated by the Legislature at the time such estimate is made.* * * *." (emphasis ours).

In *Draper, supra*, cited with approval in our original opinion, we said this estimate was not really an estimate but was a formula by which the revenues to be received during the next biennium could be reduced to a mathematical certainty. Draper construed the above Constitutional proviso and also considered Article 10, § 23a of our Constitution. Intervenor argues that Draper limited the period of time in which the Legislature may make an appropriation of "surplus funds", and that surplus funds can only be appropriated during the Legislative session in which the surplus accrues: and, if not appropriated during such Legislative session, it is subject to appropriation only after there is on hand the full amount of cash required to satisfy the current fiscal year's appropriations. Under Intervenor's theory the 1975 Legislature would have been authorized to appropriate the $80,265,824.66 in surplus prior to June 30, 1975; but since the 1975 Legislature did not do so, no part of the surplus is available for appropriation until the surplus and revenues collected are sufficient to satisfy all of the appropriation obligations of the 1975 Legislature for the current fiscal year ending June 30, 1976. Then, according to Intervenor, the Legislature would be authorized to appropriate the surplus as it accrues.

The issues in *Draper* (although not finally promulgated until 1966), concerned the computation of the estimate for the biennium beginning July 1, 1965, and what funds were available for appropriation by the 1965 Legislature. No contention was made that the surplus funds from the preceding fiscal year [fiscal year ending June 30, 1964] were not available for appropriation by the 1965 Legislature. The primary issue was whether *anticipated* surplus revenues could be included in the estimate. We held they could not, but relying on § 23a, and in particular the last sentence which provides that "any surplus monies * * * to the credit of the State General Revenue Fund shall be subject to appropriation by the Legislature", we held that if any surplus revenue funds actually accrued during the fiscal year prior to the Legislature's adjournment the Legislature could ascertain the amount and make appropriations against it. This language had reference only to the surplus funds that would accrue during the fiscal year ending June 30, 1965, and not to the surplus funds of

the preceding fiscal year (ending June 30, 1964) because the language in *Draper* could not have possibly addressed the Legislature's authority to appropriate the preceding year's surplus (fiscal year ending June 30, 1964) since the provisions of § 23 in effect at the time required such surplus to be included in the Board's estimate of funds available for appropriation by the 1965 Legislature.

Sec. 23 has been amended twice (in 1968 and in 1975) since our 1966 decision in *Draper*. The 1968 amendment changed the formula by which Board would make its estimate, but the surplus funds as in the 1941 amendment continued to be a part of the estimate. The 1968 amendment in no way affected the availability of surplus funds for appropriation.

The 1975 amendment changed the formula by which Board would make its estimate, but Board's estimate no longer included surplus funds. Under the 1975 amendment, Board would have made the same estimate prior to the convening of the 1976 Legislature whether or not there were any surplus funds; whereas, prior to the 1975 amendment, the amount of Board's estimate depended upon the amount of surplus because the surplus was included in the estimate. Intervenor points out that under the 1941 and 1968 amendments to § 23, the Legislature was authorized to transfer "the existing revenues or *surpluses* from one fund to another"; and by the 1975 amendment this language was changed and the Legislature was authorized to transfer "the existing revenues or *unappropriated cash on hand* from one fund to another." (emphasis added). Intervenor argues that the substitution of the phrase "unappropriated cash on hand" for the word "surpluses" was uniquely designed for no other purpose than to re-enforce this Court's language in *Draper*, "that a Legislature appropriates only surplus revenues actually accrued prior to the Legislature's adjournment."

There is no language in *Draper* establishing the rule of law Intervenor

contends is "re-enforced" by the substitution of the phrase "unappropriated cash on hand" for the word "surplus". Assuming, arguendo, that such phrase has some restrictive meaning, the context in which it is used must be considered. The phrase is found in a provision authorizing the transfer of monies "from one fund to another". It may not be construed as prohibiting the Legislature from appropriating the surplus funds in question.

Intervenor contends that the Legislature in presenting the proposed 1975 amendment to the people intentionally struck all reference to "surplus" and its inclusion in Board's estimate to prohibit the expenditure of surplus funds until there was on hand sufficient cash to satisfy the current fiscal year's appropriations. Intervenor states that the Legislature has never appropriated immediately in the ensuing session the surplus funds which had accrued on June 30th of the previous fiscal year since the adoption of the 1941 "budget balancing" amendment; and there has always been a one year lag in the expenditure of surplus.

Sec. 23, as amended in 1975, does not authorize Board to include surplus funds in its estimate. It neither authorizes nor prohibits the appropriation of surplus funds. It simply contains no directions or restrictions concerning surplus funds. Under no theory of Constitutional construction may we hold that § 23, prohibits the Legislature from immediately appropriating all or any part of the surplus funds in question. However, § 23a does address itself to surplus funds and provides that "any surplus monies * * * shall be subject to appropriation by the Legislature." We find *no* reason to modify our holding in our original opinion that the Legislature may immediately appropriate all or any part of the surplus funds in question.

Petition for Rehearing Granted; and Supplemental Opinion on Rehearing adopted.

All the Justices concur.