Dear Representative McCorkell,
¶ 0 The Attorney General has received your request for an official opinion asking, in effect:
1. Is the authorization of the transfer of income tax credits asspelled out in 74 O.S. 5061.7 (1988) constitutional in lightof the terms of Article X, Section 15 of the OklahomaConstitution?
2. Does this statute reflect an unconstitutional delegation ofauthority by the Legislature to the Oklahoma Capital InvestmentsBoard?
3. Do such provisions interfere with the constitutionalrequirement for uniformity of taxes?
4. Do such provisions constitute an unconstitutional forgivenessof debt?
5. Do such provisions constitute in any way "deficit financing"as prohibited in Article X, Section 15 of the OklahomaConstitution?
6. Assuming the lawful purpose and implementation of the programoutlined in this statute, would the Legislature or the Governorever have the ability to repeal or modify the transfer of suchtax credits after the Oklahoma Development Finance Authority hasentered into contracts for the transfer of the tax credits, or asto option agreements providing for future, contingent transfers,or after the Authority has extended guarantees to qualifiedinvestors when such guarantees could be supported only by theproceeds derived as a result of the transfer of these taxcredits?
7. Are the tax credits that are extended by the Authoritybinding upon the Oklahoma Tax Commission?
¶ 1 The 1987 Oklahoma Legislature adopted a number of far-reaching statutory provisions aimed at stabilizing the state's economy and at attracting new or expanded business ventures in the state, by the adoption of House Bill No. 1444. Okla. Sess. Laws 1987, ch. 222, p. 1319. The 1988 Legislature, in turn, amended some of these provisions in Senate Bill No. One of the Third Extraordinary Session of the Forty-First Legislature. See, Okla. Sess. Laws 1988, ch. 2, 4-7, pp. 1862-1864. A brief review of the pertinent terms of these Bills is necessary to adequately frame the many questions about which you have sought advice. Sections 41 through 48 of House Bill No. 1444, codified now at 74 O.S. 5061.1-74 O.S. 5061.9 (1988), are entitled the "Oklahoma Capital Investment Act."
¶ 2 Under the Capital Investment Act's provisions, a statutory statement of need and purpose is expressed, reciting generally that fundamental changes have occurred in the financial markets of the state, nation, and world, and that Oklahoma needs to increase the availability of privately managed equity and near-equity financing for "emerging, expanding, and restructuring enterprises in the state." 74 O.S. 5061.2(A) (1988). A new entity of state government was established under the Act, the "Oklahoma Capital Investment Board" (hereafter "the Board"), with the express purpose of mobilizing new private sector equity and near-equity capital for investment in ways designed to promote new jobs and to diversify and stabilize the state's economy. 74O.S. 5061.2(B) (1988); 74 O.S. 5061.3 (1988).
¶ 3 The Board, in turn, is declared to be "a separate and distinct administrative division" of the Oklahoma Development Finance Authority, with its own segregated funds, accounting system and administration. Id. It consists of five persons appointed by the Oklahoma Futures, a state board also created by the terms of the same Bill. See, 74 O.S. 5002.1(C) (1988). The Board is intended to work very closely with the Oklahoma Futures in a number of ways. See generally, 74 O.S. 5061.4,74 O.S. 5061.6 (1988). The Board is statutorily obligated to prepare a long-term "five-year policy plan" and an "annual business plan" to effectuate its purposes. Id. Those plans, however, must be reviewed and approved by the Oklahoma Futures before they can be implemented. 74 O.S. 5061.4 (1988). The annual business plan of the Board must be consistent with the long-range five-year policy plan. Id.
¶ 4 These plans, themselves, take into account the manner in which the Board handles the issuance of some very unique and, at least in Oklahoma law, revolutionary techniques for attracting private equity and near-equity capital in the state. 74 O.S.5061.7 outlines a procedure whereby income tax credits may be extended by the Authority for ultimate transfer to investors or investment groups, who may, in turn, transfer these tax credits to any third parties of their choice.
¶ 5 Under subsection (A), the State has facially transferred Fifty Million Dollars of state income tax credits to the Authority. These tax credits are declared to be "freely transferrable to subsequent purchasers." However, the subsection also provides that no such credit shall be exercisable before July 1, 1990, nor after July 1, 2003. Hence, the utilization of these credits cannot be until that initial future date comes to pass. The Authority may not transfer tax credits except in conjunction with a legitimate call on an authority guarantee.Id. Of this Fifty Million Dollars, no more than Ten Million Dollars in credits may be transferred by the Authority which may be claimed and used to reduce the tax otherwise imposed by law for any one fiscal year. The Authority, in this regard, is required to clearly indicate on the face of whatever documentation it issues evidencing the transfer of credits both the face amount of the credits thereby transferred and the taxable year(s) for which the credit may be claimed. 74 O.S.5061.7(B) (1988). Failure to claim the tax credit for the taxable year(s) for which the credit is designated on the certificate or other documentation results in a loss of the credit for any other year. Id.
¶ 6 Travelling with this power to issue tax credits against state income tax liability is a coordinate set of directions contained in 74 O.S. 5061.8. That section provides that the Board shall establish criteria for the selection of persons, firms or corporations deemed qualified to generate capital for investment in the State in ways intended to diversify and stabilize the economy and which will result in financially sound decisions minimizing the need for the Authority to transfer any tax credits. Those criteria are required to include the applicant's level of experience, quality of management, investment philosophy and process, historical investment performance, probability of success in fund raising, the amount and timing of fees to be paid, and such other investment criteria as may be commonly used in professional portfolio management as the Board may deem appropriate. Id.
¶ 7 Section 5061.8 goes on to state that the Authority has the power to "extend a guarantee, in the form of a put option or such other method as selected by the Board," in an amount equalling no more than fifty percent of the principal amount of invested capital of an investor group or groups, or investment portfolio(s) invested by such entities. This guarantee may not extend to any fewer than ten identifiable and separate investments in any one portfolio of investments, and in no case may the Authority extend a guarantee in any form for investment by an investor or investment group as to any single debt, equity or other security. Id. The Board has the power to authorize the Authority to charge a reasonable fee for costs and fair compensation of risk associated with its guarantee of investor groups and portfolios in accordance with the investment criteria provided for in 74 O.S. 5061.8(A). 74 O.S. 5061.8(C) (1988).
¶ 8 These guarantees, in whatever form negotiated, may be made for any time period, but no term of a guarantee may expire before July 1, 1990, the date that any of these tax credits are first exercisable. Id. Under 74 O.S. 5061.8(C), the guarantees of the Authority "shall in no way be an obligation of the state" and may be restricted to specific funds or assets of the Authority. Further, under the 1988 amendments to this program, proceeds from the sale of any tax credits must be sufficient to meet the contractual guarantee obligations of the Authority. Id.
¶ 9 Subsection (D) then states that if the Authority purchases any security by contractual agreement with an investor or investment group, the Authority shall acquire such securities and may invest, manage, transfer or dispose of them in accord with policies for the management of assets so acquired that are contemplated as being drafted by the Board, itself. Any proceeds from the disposition of an asset, in this vein, if not required for the purpose of the Board, may be transferred to the State General Revenue Fund.
 I
¶ 10 You initially inquire as to the legitimacy of the State's having granted the income tax credits to the Authority, in light of the provisions of Article X, Section 15 of the Oklahoma Constitution, which states:
 The credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or association, municipality, or political subdivision of the State; nor shall the State become an owner or stockholder in, nor make donation by gift, subscription to stock, by tax, or otherwise, to any company, association, or corporation.
¶ 11 With reference to the making of prohibited gifts, there is a long line of case law in this State that previously stood for the proposition that the State cannot make grants of monies to non-state entities, even for legititmate public purposes. See,Vette v. Childers, 228 P. 145 (Okla. 1924); Veterans of ForeignWars v. Childers, 171 P.2d 618 (Okla. 1946). However, this strict line of authority was largely revamped by a 1981 decision of the Oklahoma Supreme Court in Way v. Grand Lake Association,Inc., 635 P.2d 1010 (Okla. 1981).
¶ 12 In Way, the Court was asked to review the legitimacy of claims for payment rendered under the authorization of a legislative promulgation authorizing the use and expenditure of public funds to reimburse private entities for their activities in promoting tourism in the State. Without going into exhaustive detail as to the history and resolution of the case, the Court advised that the legislative authorization was valid. This rationale was primarily predicated upon a finding that the legislation served a legitimate public purpose, and contained adequate detailed conditions, safeguards and controls to assure the proper use of the funds in question. Id. at 1015.
¶ 13 In light of the Way decision, the language contained in the Capital Investment Act does provide the type of legislatively mandated controls, safeguards and conditions required for the Authority to receive and disburse the income tax credits granted to it. Minimum criteria to assure prudent investment activities designed to effectuate the public purposes behind the Act's passage have been set forth in 74 O.S. 5061.8(A), 74 O.S.5061.8(C). To effectuate the Legislature's intent, it has decreed that the Board take into consideration the applicant's level of experience, quality of management, investment philosophy and process, historical investment performance, probability of success in fund raising, the amount and timing of fees to be paid, and such other investment criteria as may be commonly used in professional portfolio management as the Board may deem appropriate. 74 O.S. 5061.8(A) (1988). The Legislature has provided that the sale of any tax credits under these statutes must return sufficient revenues to meet any contractual guarantee obligations of the Authority. 74 O.S. 5061.8(C) (1988). Additionally, of course, the Legislature has provided for a number of statutory guidelines that public trusts must adhere to in the carrying out of trust business. See, 60 O.S. 176 (1981) et seq., as amended.
 II.
¶ 14 You ask next whether the Legislature's authorization to the Board to adopt criteria for the selection of persons or business enterprises who will be permitted to contract with the Authority for the tax credits and put options set forth in the Act constitutes an unlawful delegation of authority. The general rule followed in Oklahoma regarding the Legislature's power to delegate its authority is expressed in Associated Industries ofOklahoma v. Industrial Welfare Commission, 90 P.2d 899 (Okla. 1939), where the Court held, in paragraph four of the Syllabus by the Court:
 Power to determine the policy of the law is primarily legislative, and cannot be delegated whereas the power to make rules of a subordinate character in order to carry out that policy and apply it to varying conditions, although partaking of a legislative character, is in its dominant aspect administrative and can be delegated.
90 P.2d at 901.
¶ 15 The Legislature cannot delegate legislative power, but it may delegate authority or discretion to be exercised under and in pursuance of the law. It may delegate power to determine some fact or state of things upon which the law makes its own operation depend. Isaacs v. Oklahoma City, 437 P.2d 229, 233
(Okla. 1967); A.G. Opin. No. 83-189. In this case, the Legislature has set forth detailed guidelines that are mandatory in nature and must be adhered to by the Board. The further delegation to the Board to promulgate by rule additional criteria that will best serve the State's interests in transferring the tax credits, and making the guarantees set forth in the Act in the most prudent manner, is a legitimate delegation of the power of the Legislature.
 III
¶ 16 Does the extending of these tax credits somehow impinge upon the requirement of Article X, Section 5 of the Oklahoma Constitution that all taxes be uniform on the same class of subjects? Under the rationale expressed by our Supreme Court inJohnston v. Oklahoma Tax Commission, 497 P.2d 1295 (Okla. 1972), the answer to that question is negative, as the terms of that constitutional provision were held in Johnston to be applicable only to property taxes. Accord, A.G. Opin. No. 81-153.
 IV
¶ 17 Your fourth question inquires whether the transfer of these tax credits to third persons totally foreign to the initial contractual agreement between the Authority and an investor or investment group constitutes an unlawful forgiveness of liability on the part of the transferee as generally referred to in ArticleV, Section 53 of the Oklahoma Constitution. That provision prohibits the Legislature from ever releasing or extinguishing, or authorizing the releasing or extinguishing of indebtedness, liabilities or obligations of any corporation or individual to the State, with some exceptions to the general rule inapplicable to your areas of concern.
¶ 18 It is clear under this constitutional provision that the Legislature is absolutely forbidden to release or otherwise extinguish accrued tax liabilities such as delinquent taxes owed.Thompson v. Smith, 114 P.2d 922 (Okla. 1941). Similarly, the Legislature is forbidden to attempt to pass tax exemptions that attempt to retroactively operate to cover past taxable transactions. Ward v. Oklahoma Tax Commission, 322 P.2d 172
(Okla. 1958).
¶ 19 However, in this instance, such prohibitions are not impacted upon by the tax program in issue. It must be observed that the issuance of these tax credits operates to forgive taxes that might be owed for future tax years only, from July 1, 1990, to July 1, 2003, and can never be used to attempt to reduce or extinguish tax debts owed for past tax years. Accordingly, the tax credit issuance operates in a manner similar to that of a prospective exemption from income taxation for the holders of the credits, and under the rationale of Ward, supra, would not constitute a forbidden extinguishment of debt.
 V
¶ 20 Does the extension of guarantees such as put options under74 O.S. 5061.8(C) by the Authority constitute an unlawful issuance of the credit of the State, as prohibited by Article X, Section 15 of our Constitution? Again, the answer is negative. It is crucial to note that the tax credits that have been transferred have been granted to the Authority, a public trust under the laws of the State. 74 O.S. 5062.2(C) (1987).
¶ 21 The question of whether a public trust could validly loan its credit to a private corporation in the interests of providing an incentive to expand industry and provide jobs for the state was examined in depth in Attorney General Opinion No. 86-131. That Opinion noted that the funds of public trusts are separate and distinct from the general governmental funds of the State and also that public trusts are distinct legal entities from the State. Accordingly, the Attorney General advised that such contractual relationships were permissible between public trusts with the State as its beneficiary. The terms of 74 O.S.5061.8(C), in this regard, are quite clear that the guarantees extended by the Authority "shall in no way be an obligation of the state and may be restricted to specific funds or assets of the Authority." Hence, the rationale expressed in A.G. Opin. No. 86-131 is deemed dispositive of your question in this area as well.
 VI
¶ 22 Your sixth question asks for consideration of whether the transfer of these tax credits or the extension of a guarantee by the Authority, once entered into, may be unilaterally modified or abrogated by subsequent actions by the Legislature or the Governor, or by any other officer of the State. Article II, Section 15 of the Oklahoma Constitution prohibits the adoption of any law which would impair the obligation of contracts lawfully entered into by capable parties. Article V, Section 54 provides that no repeal of a statute can affect any accrued rights that have been gained thereunder. See, e.g., Baker v. OklahomaFirefighters Pension and Retirement System, 718 P.2d 348 (Okla. 1986); Prudential Property and Casualty Co. v. Grimes,725 P.2d 1246 (Okla. 1986). Accordingly, your question is answered in the negative.
 VII
¶ 23 You ask in closing whether the extension of tax credits by the Authority to investors is binding upon the Oklahoma Tax Commission. It is clear that the Legislature has full authority in this State to address all areas of rightful legislation, and that its power in this regard is limited only by specific federal or state constitutional grounds. Draper v. State Bd. ofEqualization, 414 P.2d 276 (Okla. 1966). The Tax Commission is an entity of the State, governed generally by the terms of the Oklahoma Tax Code. See, 68 O.S. 102 (1987). It has been held on numerous occasions that the Tax Commission is bound by laws passed by the Legislature. See, e.g., State ex rel. Oklahoma TaxCommission v. Daxon, 607 P.2d 683 (Okla. 1980). The Legislature having spoken to the area of the transfer of tax credits to the Authority, the Commission has no authority to refuse to follow the Act's terms, assuming, of course, the lawful transfer and use of any credits in question.
¶ 24 It is, therefore, the official opinion of the AttorneyGeneral that:
1. The granting to the Oklahoma Development Finance Authority oftransferrable income tax credits, as called for in 74 O.S.5061.7(A) (1988), is not violative of the terms of Article X,Section 15 of the Oklahoma Constitution which prohibit the makingof gifts by the State to third parties.
2. The delegation to the Oklahoma Capital Investment Board ofthe authority to establish criteria by which investors andinvestment groups are to be deemed suitable for eligibility toreceive the tax credits and guarantees referred to in the Act isnot an unlawful delegation of authority.
3. The extension of transferrable tax credits under the terms ofthe Act do not constitute a violation of Article X, Section 5 ofthe Oklahoma Constitution.
4. The extension of these transferrable tax credits does notconstitute an unlawful extinguishment or release of debt by theState, as generally prohibited by Article V, Section 53 of theOklahoma Constitution.
5. The extension of guarantees by the Authority to investors andinvestment groups under the Act does not constitute an unlawfulextension of the credit of the State, as the Authority is apublic trust with funds and legal status separate from the statefor such purposes.
6. Once lawfully made, tax credits and guarantees extended bythe Authority are binding legal obligations that may not beinterfered with by subsequent action of the Legislature, theGovernor, or any subsequent membership on the Authority.
7. The terms of the Act, insofar as they relate to the extendingof income tax credits to third persons, are binding upon theOklahoma Tax Commission.
ROBERT H. HENRY ATTORNEY GENERAL OF OKLAHOMA
MICHAEL SCOTT FERN ASSISTANT ATTORNEY GENERAL DEPUTY CHIEF, GENERAL COUNSEL DIVISION